MENYUK, J.T.C.
Philip Orban and Joan Orban (“Orbans”) appeal the judgments of the Hunterdon County Board of Taxation with respect to the 2001 assessments on seven vacant building lots that are part of the same ten lot subdivision. Stanley Dobis and Lauriepat Dobis (“Dobises”) also appeal the judgment of the Hunterdon County Board of Taxation affirming the 2001 assessment on an eighth parcel of vacant land purchased from the Orbans and which is part of the same subdivision. The defendant municipality has filed a counterclaim with respect to the Orban parcels only.
The Orbans and the Dobises (collectively the “taxpayers”) each seek to have their assessments rolled back to the level of the assessments for tax year 2000 on the ground that the contested assessments were spot assessments of the type invalidated in West Milford Tp. v. Van Decker, 120 N.J. 354, 576 A.2d 881 (1990). Because the facts surrounding the making of the assessments were common to both cases, the matters were tried together on the issue of spot assessment. The assessments for 2000 and 2001 were as follows:
*3 Block 3 2000 Assessment 2001 Assessment 2001 County Board Lot Number Judgment
40.01 (Orban) $ 91,000 $213,000 $148,900
40.03 (Orban) $ 83,600 $205,600 $166,900
40.04 (Orban)_$108,600_$230,600_$175,900
40.05 (Orban)_$115,000_$237,000_$175,900
40.08 (Orban) $ 93,200 $215,200 $157,900
40.09 (Orban) $ 89,100 $211,100 $157,900
40.10 (Orban)_$ 91,000_$213,000_$148,900
40.06 (Dobis) $ 80,500 $202,500 $202,500
The Chapter 123 ratio for tax year 2001 was 90.23.
The principal witnesses at trial were Philip Orban and Curtis Schick, the assessor for Alexandria Township. Lawrence Harding, who purchased Lot 40.03 from the Orbans in May 2001, and Stanley Dobis also testified. I find the following facts.
Philip Orban is an engineer by profession and has been employed in that capacity at residential, commercial and industrial sites, and has done engineering work for the roads in large and small developments. Apart from his employment by others as an engineer, Orban had completed major and minor subdivisions of family-owned properties in Middlesex and Somerset counties before undertaking the subdivision of which the subject properties are a part.
The parcel from which the subdivision was created had previously been owned by a bank, which retained an engineering firm to design the subdivision and obtain preliminary subdivision approval. That approval was obtained prior to the time that Orban and his wife acquired the property in February 1999.
Following his acquisition of the subdivision, Orban supervised the construction of the on-site improvements. The subdivision was a “B-16” minor subdivision, which permitted a maximum of ten lots and required an average minimum of ten acres per lot and a deed restriction prohibiting further subdivision. The original *4 subdivision plan submitted to the municipality termed the B-16 subdivision a “Rural Estate Residence” subdivision.
Ten lots were created by the subdivision. The subdivision plans, as originally approved by the municipal engineer, showed that nine of the ten lots in the subdivision were to front on a private road to be constructed by the developer, which was to connect to Goritz Road, a public road. One lot, Lot 40.10, was to have direct access to Goritz Road. Although it was a public road, Goritz Road was basically a gravel or dirt road in the area where the private road for the Orban subdivision was to connect.
Using the engineering drawings that had been submitted in connection with the preliminary subdivision approval, Orban described the specifications for the private road. He testified that the road was to have been 18 feet wide for the first 350 feet from the entrance at Goritz Road and thereafter was to narrow to 16 feet. He also testified that, for drainage purposes, the plans called for Belgian block curbing to be installed on that part of the road which comprised the roadway of a bridge which was be constructed near the entrance. Belgian block curbing was not required for the remaining length of the private road. Orban further testified that the plans called for a paved private road, which was to have a five inch stabilized base with an oil and chip bituminous surface coating, which gives the appearance of a gravel surface.
Orban requested certain modifications to these original plans, which were approved by the town engineer. First, as a safety enhancement, Orban determined to widen the road an additional foot on each side of the road, making the road 18 feet for its entire length. Second, because maintenance for the private road would have to be paid for by a homeowners association whose membership would be composed of the owners of the lots in the subdivision, he installed Belgian block curbing for the length of the road, and planned to use a higher quality surface topping, which would give a paved effect to the road.[1] Orban testified that the curbing *5 and the use of a different surface material would, over the long term, make the private road less expensive for the homeowners association to maintain. On cross-examination, Orban conceded that certain improvements made at the subdivision, such as the Belgian block curbing and underground utilities,[2] made the lots easier to market, and in fact added value to the lots, but noted that underground utilities were required by the municipality.
Except for the surface paving, these improvements were completed by May 1999 and final subdivision approval was received sometime that year. Orban testified that no further improvements were completed between May 1999 and January 2001, but that the road was nevertheless drivable and accessible to anyone who wanted to drive into the subdivision property.
The subdivision lots were assessed for the first time for tax year 2000. The assessor, Curtis Schick (who has been Alexandria’s assessor since 1981), testified that he was aware that the bridge at the entrance of the subdivision had been completed, but he did not know that the curbing and underground utilities had been installed as of the relevant assessment date, October 1, 1999. He testified that he did not visit the subdivision before making his assessments, and was unaware at that point that Orban had constructed or intended to construct improvements exceeding those required by the subdivision approval. He testified that he was familiar with the farm that had been on the property at some time prior to the subdivision, and that he had relied on comparable sales of other building lots in the municipality in making the initial assessments.
During the course of plaintiffs direct examination of Schick, there was some attempt to demonstrate that Schick should have been aware of the Belgian block curbing because he lived two or three miles away, and because his former wife lived nearby. The inference sought to be made was that Schick had had occasion to drive by and inspect the improvements. I find credible Schick’s *6 testimony to the effect that he did not visit the subdivision prior to his initial assessment of the lots for the 2000 tax year.
Schick testified that, in late 1999 or early 2000, he became aware that the private road running through the subdivision had been improved to a greater extent than the usual B-16 subdivision in Alexandria Township which, according to Schick’s testimony, generally had private roads that were surfaced with gravel, and lacked Belgian block curbing or the drainage improvements that were installed in the Orban subdivision.
In May 2000, Schick observed that several of the lots in the subdivision were listed on a multiple listing service at prices ranging from $195,000 to $275,000, substantially in excess of the assessments that he had initially placed on them, which ranged from $80,500 to $115,000. Schick testified that the offering prices were also substantially more than the sales prices of other lots in Alexandria Township. The listings described the subdivision as having Belgian block curbs, underground utilities and a paved road.
At about the same time, Schick began to receive calls from potential buyers for the Orban lots, inquiring as to the potential tax burden. Schick testified that he gave those callers information as to the current assessment, and indicated that future assessments would be based upon market value, including the value of any improvements to be constructed on the lots. He also provided information regarding the current tax rates.
Schick visited the subdivision on one or two occasions prior to making the assessment for 2001. He testified that he observed at that time that the private road constructed by Orban was “a nice road” for a B-16 subdivision, but conceded that another such subdivision identified as being on Kelsey Farms Road had a private road that appeared to be of substantially similar quality.
Just prior to January 10, 2001, the date on which his assessment list for tax year 2001 was due under N.J.S.A. 54:4-35, Schick learned of two recent sales of lots in the subdivision. By deed dated December 15, 2000 and recorded on December 28, 2000, the Orbans transferred ownership of lot number 40.07 to Lawrence *7 and Linda Shepard for a consideration of $250,000. By deed dated December 15, 2000 and recorded on January 4, 2001, the Orbans transferred ownership of lot number 40.02 to Robert L. and Donna M. Doran for a consideration of $220,000.[3] In other words, the selling prices were in the range of the asking prices that had appeared in the multiple listing service.
Schick testified that the ratio of assessed valuation to the sales price of the two parcels was so much lower than the municipality’s Chapter 123 ratio that he could not ignore the discrepancy between his assessments and the sales prices. Using computer-assisted mass appraisal techniques,[4] he increased the assessment on all 10 lots in the subdivision by $122,000 over the assessment for tax year 2000. In increasing the assessments, Schick did not distinguish the one lot that fronted on Gorwitz Road from the rest of the lots that were accessed by way of the private road: all received the same $122,000 increase. He did not change the assessments of any other vacant land in the municipality except for parcels being removed from farmland assessment or new lots created as a consequence of a subdivision.
Schick testified that he was simply wrong when he made his initial assessments for the subdivision for tax year 2000. He further testified that he does not know why the sales prices for the Orban lots turned out to be so much higher than the sales prices of what he believed to be comparable lots upon which he based the tax year 2000 assessments. He thought that the superior quality of the private road and drainage improvements contributed to the *8 sales price, but conceded that one other B-16 subdivision had a private road of comparable quality. He noted, however, that the multiple service listings emphasized the road and underground utility improvements.
In hindsight, Schick believed that the high sales prices of the lots were due in part to Orban’s skilled marketing of the lots, particularly in his insistence on certain deed restrictions as to the use of the property. He did not learn of those restrictions until after he had examined the first deed that came into his hands.
Although the restrictions were not always identical, each deed provided, for example, for architectural review and approval of building plans and specifications by Orban. Homes were to be a minimum of 3,000 square feet, excluding the basement and garage. There were certain other covenants that were also intended to maintain the character of the subdivision, such as a prohibition on above-ground pools and a requirement that any accessory buildings conform in style and exterior quality to the home constructed on the lot. Orban referred to the homes to be constructed as “quality homes.”
Orban testified that he wanted to give his buyers confidence that other lots in the subdivision would not be sold to someone who would put up a lesser exterior quality home or one which did not conform with the overall appearance of other homes in the subdivision. He further testified that buyers did not usually bargain extensively over the price of the lot, but that the terms of the deed restrictions were frequently a subject of negotiation.
I find that Schick increased the assessments on the subdivision lots for tax year 2001, based upon his review of the asking prices for the lots as disclosed by the multiple listing service, and upon the December 2001 sales prices. In so finding, I note that there was extensive testimony by Orban and by Schick regarding certain conversations they had about two lots in which Schick had an ownership interest. The taxpayers and the municipality have differing views as to the significance of those conversations and their relationship to the assessments in issue here.
*9 Schick has a quitclaim deed for Block 3, Lot 90 in Alexandria Township. That lot is adjacent to Block 3, Lot 53, which is also owned by Schick. Lot 90 is contiguous with the Orban subdivision. Lot 53 and Lot 90 consist of 2.4 acres and 7.85 acres, respectively, of vacant land. Both appear on the tax map of Alexandria Township as landlocked, without any deeded right of way to a public road, although there was some testimony by Schick to the effect that there is evidence of an old “driftway” or driveway through the Orban subdivision to Goritz Road. Any right to such access, however, has never been tested in court. Schick testified that, prior to the subdivision of the property by Orban’s predecessor, he had spoken with adjoining property owners about acquiring access to Lots 53 and 90. Both properties have minimal assessments, based upon their lack of a right of way.[5]
Schick also testified he had retained an attorney several years ago for the purpose of gaining clear title to Lot 90. While Schick did not make clear whether there is currently a pending action, he testified that his attorney is continuing to pursue the matter, but at a slow pace, since the matter is not a high priority.
Both Schick and Orban testified as to two conversations about Schick’s properties. The first occurred in November 1999 at a planning board meeting. Schick testified that Orban approached him; Orban’s recollection was that Schick initiated the conversation. Schick and Orban agree, however, that they discussed the possible purchase of Schick’s property by Orban, who was contemplating either adding the property to one or more of the existing lots, or adding an additional lot to the subdivision. Orban also testified that he had an interest in the property because he wanted control over what would be developed adjacent to his subdivision. Schick and Orban also agree that they discussed the possible acquisition by Schick of an easement over Orban’s property. Schick and Orban both testified that Schick was not inclined to commit himself to selling his property at that time because he did *10 not have clear title to Lot 90, and because he would have had to discuss any sale of Lot 53 with his former wife, who has an interest in that property. Neither Schick nor Orban mentioned a selling price.
Schick and Orban also agreed that their second conversation was on September 21, 2000. Schick maintained that Orban initiated the telephone call and Orban did not recall who initiated it. The issues of the acquisition of Schick’s property by Orban and of Schick’s acquisition of an easement over Orban’s property were once again discussed. Orban inquired as to whether Schick intended to develop the property for his personal use or whether he intended to sell it for a profit. Orban advised Schick at that time that if the property was not to be used by Schick personally, he would prefer to develop it together with the other property in the subdivision. No prices were discussed, and Schick and Orban had no further discussions on the subject.
It is Orban’s belief that Schick increased the assessments on the subdivision lots in retaliation for Orban’s refusal to give him an easement. Schick pointed out that, if he had an interest in an easement over Orban’s property, he certainly would not advance that interest by antagonizing Orban. When asked directly whether he had any intent to discriminate against Orban or to conduct a vendetta against him, Schick denied any such intentions.
Based upon my observation of the demeanor of the witnesses and their testimony, and considering the circumstances surrounding the assessments in issue, I find Schick’s denials credible, and conclude that Schick raised the assessments on the subdivision lots for tax year 2001 based solely upon his review of the asking prices for the lots as disclosed by the multiple listing service, and upon the December 2001 sales prices.
There remains the issue of whether the assessments were invalid spot assessments. It is the taxpayers’ position that Schick failed to give them equal treatment as compared with other owners of vacant building lots in Alexandria Township. They point to the fact that, except for lots losing farmland status, or new lots created by subdivision, or lots on which improvements *11 were added, only the lots in the Orban subdivision had higher assessments in 2001 than in 2000. They also emphasize that any claims by Schick that he increased the assessments because of the quality of the private road or of the other improvements are not credible, because Schick had access to the approved subdivision plans and could have viewed the road at any time prior to making his assessments. Reduced to its essentials, they contend that Schick’s reasons for raising the assessments were pretextual and that they were unfairly singled out.
The municipality argues that this case is not akin to West Milford Township v. Van Decker, supra, 120 N.J. 354, 576 A.2d 881, which condemned the practice of singling out homes which had been recently sold for reassessment, while leaving the assessments of other houses untouched. Here, Schick’s initial assessment of the lots for tax year 2000 proved to be wrong, based both on Orban’s asking price for the properties, and on the sale of two lots in December 2000. The municipality asserts that Schick selected the appropriate unit for reassessment — the Orban subdivision — and raised the assessments on all ten lots.
In Van Decker, the Court found that spot assessment of the “welcome stranger” variety, that is, where only the assessments on properties sold during the prior year are changed, violates the Uniformity Clause of the New Jersey Constitution, N.J. Const. art. VIII, § 1, ¶ 1(a), and the Equal Protection Clause of the United States Constitution, U.S. Const. amend. XIV, § 1. The Uniformity Clause guarantees equality of treatment and burden in taxation. Van Decker, supra, 120 N.J. at 360-61, 576 A.2d 881, 884-85. The Equal Protection Clause protects an individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class. Id. at 362-63, 576 A.2d at 885-86.
The practical effect of spot assessment is that recent purchasers have their property reassessed on the basis of current market values, whereas properties of equivalent market value that have not recently been sold have their existing assessments continued from year to year. Assuming that property values are increasing, *12 the new owner will have a greater proportionate tax burden than an owner who has held property of equal market value over a long period of time. Id. at 361-62, 576 A.2d at 884-85.
Revisions of some but not all assessments of a given class of property are not, however, always constitutionally invalid. Van Decker cited several examples of such permissible reassessments, such as revisions based on new improvements which increase the value of the property; the addition of formerly exempt property; the reassessment of apartments converted to condominiums; the reassessment of all apartment complexes in a township based on the adoption of a vacancy decontrol ordinance; and the reassessment of all industrial and commercial properties based on a study showing they were underassessed as a class. Id. at 362, 576 A.2d at 885.[6] In this case, the taxpayers implicitly acknowledge that the subdivision of a large parcel into several smaller lots is a legitimate reason for placing new assessments on the individual lots that do not necessarily equal the former assessment placed on the larger parcel.
In Mountain View Crossing Investors, L.L.C. v. Wayne Tp., 20 N.J.Tax 612, 2003 WL 21788929 (Tax 2003), Judge Kuskin reviewed Van Decker and two recent Appellate Division cases involving allegations of spot assessment, Centorino v. Tewksbury Tp., 20 N.J. Tax 35 (App.Div.2001), cited by the taxpayers here, and Brunetti v. Cherry Hill Tp., 21 N.J.Tax 80, 2002 WL 32139430 (App.Div.2002), certif. denied, 175 N.J. 547, 816 A.2d 1049 (2003). Judge Kuskin observed that Van Decker concerned itself with “welcome stranger” assessments, Mountain View Crossing Investors, supra, 20 N.J.Tax at 617, and that the Su *13 preme Court in Van Decker identified two criteria of an invalid assessment: first, the assessment must be based solely on a sale of the property; second, the assessments on other properties of the same class are not revised. Id. at 618.
In Centorino, the Appellate Division found insufficient the assessor’s explanation that the sale of the subject property had caused him to determine that the property had been improperly categorized as a construction class 18 rather than as a class 20. The court held that, “[w]here the assessor’s appraisals of the differences between these classes was so obviously subjective and discretionary, and not readily discernible, the tax assessor must establish additional objective proofs ... in order ... to justify his statement that the subject property was not singled out solely on the basis of its sale.” Centorino, supra, 20 N.J.Tax at 43.
In Brunetti v. Cherry Hill Township, supra, the assessment on the subject property was increased to approximately the sale price contained in a contract of sale. The sale had not closed at the time of the making of the assessment and there was no evidence that the assessor was aware of the contract. 21 N.J.Tax at 81-83. The Appellate Division affirmed the Tax Court decision, which had concluded that there was an adequate independent basis for reassessment where the assessor had inspected the property upon an application for farmland assessment and discovered that, contrary to the description on the property record card, the property contained no wetlands. Id. at 86. Judge Kuskin concluded that:
The Van Decker, Centorino and Brunetti decisions, when read together, hold that a prohibited spot assessment occurs only when the assessor has no basis for revising the assessment other than a sale of the property. An assessor may revise assessments for “legitimate reasons” independent of a sale even in the absence of a municipal-wide revaluation.
[Mountain View Crossing Investors, supra, 20 N.J.Tax at 620].
In the present case, the reassessment of the taxpayers’ properties resulted from the asking prices of the lots disclosed by a multiple listing service, as those prices were subsequently confirmed by the December 2000 sales of two lots. Multiple listing service property descriptions have been held to be valid independent reasons for reassessing properties, where the listings revealed discrepancies between the actual characteristics of the properties and the property record cards. Corrado v. Montclair Tp., 18 N.J.Tax 200 (Tax 1999). Reassessing a single neighborhood is also permissible. See Shippee v. Brick Township, 20 N.J.Tax 427 *14 (Tax 2002), appeal docketed, Nos. A2538-02T3, A2539-02T3, A2542-02T3 (App.Div. Dec. 31, 2002), which upheld the reassessment of properties within one of approximately 600 neighborhoods within the municipality, finding that the assessor’s determination that prices in the neighborhoods were changing at different rates was a legitimate basis for revising assessments within those neighborhoods where prices had changed the most.
The subject lots had been assessed for the first time just the previous tax year. As noted above, Van Decker recognized that there are legitimate reasons for the revision of assessments not amounting to a municipal-wide revaluation. 120 N.J. at 362, 576 A.2d at 885 (citing among other cases, Schwam v. Cedar Grove Tp., 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988), certif. denied, 115 N.J. 76, 556 A.2d 1219 (1989) (finding appropriate the reassessment of apartments converted to condominiums)). Clearly, the reassessment of a former single parcel as individual subdivided lots is also outside the ambit of “spot assessment.”
The subject lots had been reviewed the year before for their initial assessments and had been compared with what the assessor at that time believed to be the same class of properties, that is, other vacant building lots in the municipality. It was on the basis of comparable sales of that class of properties that Schick made the initial assessments for tax year 2000. During 2000, the listing prices for the subject properties and the December sales indicated to the assessor that, compared with the sales of other building lots outside the subdivision, the Orban lots commanded a higher price in the marketplace. He therefore increased the assessments.
The assessments in issue here were not made in a vacuum, nor were they based solely on the sales of the subject lots. They were based upon the sales of the subject lots as compared with the sales of other building lots. What singled the Orban lots out was their market value, which is the appropriate measure of assessment. An assessment is the assessor’s determination based on the price at which, in the assessor’s judgment, a parcel of property would sell for at a fair and bona fide sale by private contract on October 1 preceding the tax year. N.J.S.A. 54:4-23.
A taxpayer does not acquire a vested interest in an initial assessment. An estimate of the value of newly subdivided vacant *15 residential lots that are located apart from other such properties is subject to considerable uncertainty. Location is an especially important factor in the value of residential properties, and, to some extent, a subdivision creates its own location. Clearly, a neighborhood analysis will be incomplete until information about the new neighborhood is available. An initial assessment of such properties is necessarily tentative and may need to be significantly revised when additional information becomes available to the assessor, including sales information. This process of assessment revision for newly subdivided vacant properties is not the “arbitrary intentional discrimination” struck down in Van Decker, supra, 120 N.J. at 362, 576 A.2d at 885, but is the result of good faith efforts to assess property as mandated by N.J.S.A. 54:4-23.
Notably, as made clear in the Tax Court decision in Schwam v. Cedar Grove Township, 9 N.J.Tax 406, 408-10 (Tax 1987), which was subsequently affirmed by the Appellate Division, Schwam v. Cedar Grove Tp., supra, 228 N.J.Super. 522, 550 A.2d 502, the initial assessments on the individual condominium units, held not to be spot assessments, were made after there had been sales of some of the units and were made with the benefit of knowledge of the sales prices. In this case, the assessor had no sales in the subdivision upon which to base his initial assessments, and even now he is does not know why the Orban lots actually sold for more than other building lots that he believed to be comparable. He is not required to have this knowledge. All he is required to do is determine the market value of the lots.
There was a legitimate independent reason for the reassessment of the subject properties: the initial assessments were based upon the premise that the Orban lots had a value equivalent to other vacant building lots in the taxing district. That premise was subsequently demonstrated to be clearly erroneous. Under the taxpayers’ theory of spot assessment, they are entitled to pay less than their fair share of taxes indefinitely unless the municipality undertakes a revaluation or reassessment of the entire taxing district in order to correct the assessor’s mistake with respect to ten building lots. That is not what was intended by Van Decker or by Centorino. With respect to a group of properties intended *16 to be marketed for sale, such as the lots here, which were initially assessed before any sales within the group had been made, the assessor may properly use subsequent sales as a measure of whether the group had been appropriately classified at the outset, and he may validly re-classify the group and re-assess it if necessary.
For the foregoing reasons, I conclude that there was no invalid spot assessment of the subject properties. The actions will proceed on the issue of valuation.

 At the time of trial, the surface topping had not yet been completed.

 These improvements were featured in a real estate classified advertisement offering the remaining subdivision lots for sale. The ad was placed in the Newark Star-Ledger in February 2003, subsequent to the period in issue here.

 The Orbans transferred ownership of Lot 40.06 to the Dobises by deed dated March 5, 2001, recorded March 14, 2001 for a consideration of $255,000. They transferred Lot 40.03 to Lawrence Harding by deed dated May 17, 2001 and recorded June 5, 2001, for a consideration of $224,000. Neither of these sales were implicated in the assessments at issue here, having taken place well after January 10, 2001, the date by which the assessment list had to be filed.

 “Computer-assisted mass appraisal” is defined, in relevant part, by the Appraisal Institute, The Dictionary of Real Estate Appraisal 57 (4th ed.2002), as: “The application of computer technology and statistical techniques to the solution of appraisal problems; used in assessment administration to derive value indications in the cost and sales comparison approaches...”

 Schick testified that these assessments were reviewed by the Division of Taxation, apparently as part of an ongoing program intended to prevent assessors' conflicts of interest.

 See N.J.S.A. 54:4-23, as amended by L. 2001, c. 101, § 1, effective June 14, 2001. The statute requires that, where an assessor has reason to believe that property constituting all or part of a taxing district has been assessed at a value higher or lower than is consistent with the constitutional requirement of uniformity, the assessor must obtain certain approvals from the county board of taxation and the Division of Taxation before proceeding with any reassessment of that property. Following the reassessment the assessor is required to demonstrate to the county board, through sampling, "that the reassessment is in substantial compliance with the portions of the taxing district that were not reassessed."