ANDREW, J.T.C.
In this local property tax matter plaintiff,' Watnong Associates, Inc., seeks substantial reductions in its local property tax assessments for the tax year of 1988, a year in which defendant, Morris Township, implemented a district-wide revaluation.
The subject of this proceeding, commonly identified as “The Summit at Morris Township,” consists in its entirety of 109.858 acres of vacant land. The entire property is located in the northwestern section of Morris Township and, according to defendant’s appraisal expert, “is bordered by residential developments to the south, senior citizen housing to the west, vacant land and [an] older residential development to the north, and schools to the [east].” The subject fronts on a semi-rural two-lane road known as Ketch Road in the township.
This 109.858-acre parcel was acquired by plaintiff-taxpayer at a public auction on October 21, 1985 from the State of New Jersey for $7,000,000. The transaction, which was consummated on March 5, 1986, was an unconditional cash sale. There is no dispute that this sale constituted a valid arms-length transaction.
The property was, at the time of purchase, and is now, zoned RA-25 (single-family residential district) pursuant to the zoning ordinance of Morris Township. The minimum lot size in this district is 25,000 square feet for a single-family detached residence. Subsequent to its purchase, plaintiff sought and obtained preliminary approval for a major subdivision. According to the record, plaintiff did not seek any changes in zoning or variances or deviations from the existing bulk zoning requirements set forth in the township’s zoning ordinance. Preliminary subdivision approval was granted by the Morris Township Planning Board on December 1, 1986.
At the time of its purchase, plaintiff had anticipated obtaining subdivision approval for approximately 148 lots in accordance with all of the requirements of the township’s zoning ordinance. The planning board permitted a subdivision of 144 *111 lots in two sections. Section I consisted of 48[1] lots and involved approximately 36.266 acres of the 109.858-acre tract and section II consisted of 96 lots and involved the remaining 73.592 acres of the entire tract.
Plaintiff applied for and received final subdivision approval for the 48 lots in section I on August 3, 1987. Thus, as of the assessment date in question, October 1, 1987, the property implicated in this proceeding consisted of 48 separately assessed building lots and one large parcel consisting of 73.592 acres that had preliminary subdivision approval for 96 lots.
The 48 individual lots in section I ranged in size from approximately .57 acres to 1.1411 acres, but it was uncontroverted that the typical lot was approximately .57 acres. According to defendant’s appraisal expert,[2] the assessments for the 48 lots were arrived at by employing a basic unit or lot value of $120,000 for each lot of approximately .57 acres. Adjustments for differences in size in excess of the basic unit were based on a value of $95,000 an acre proportioned for the excess.
The assessments for the 48 lots, in the aggregate, were set at:
Land $7,004,100
Improvements 75,000[3]
Total $7,079,100
The 73.592-acre parcel referred to as section II which only *112 had preliminary subdivision approval as of the assessment date was assessed at:
[[Image here]]
According to a copy of the property record card for section II, the assessment was developed on the basis of the land having a value of $150,000 an acre (73.592 acres X $150,000 = $11,038,-800).
Thus, the assessment, in the aggregate, of the 49 parcels for tax year 1988 was:
[[Image here]]
The appraisal experts for both parties were in agreement that the highest and best use of the subject was for a residential development of single-family dwellings in accordance with the township zoning ordinance.
The resolution of a local property tax case requires, in many instances, a determination of which one or more of the three traditional valuation approaches may be the most reliable under the circumstances. Here, essentially because the subject parcels were vacant land, the appraisers for both parties relied solely on the direct sales comparison approach. The experts, however, viewed the property differently, and thus used different market data and different units of comparison to arrive at dramatically diverse results.
Plaintiff’s expert viewed the property as two tracts, section I being 48 separately assessed finished building lots and section II being a 73.592-acre tract of raw unimproved land. The record indicates that, as of the assessment date, the site improvements were so minimal that little mention of them was made by either expert.
*113 With regard to the 48 building lots, plaintiffs expert relied upon three sales of finished building lots in Morris Township. The first was a sale of a 1.77-acre lot on December 16,1986 for $266,000 or $150,282 an acre. The second sale was of a .48 acre lot that took place on March 2, 1987 for $75,000 or $156,380 an acre. The third sale was of a .80-acre lot that was consummated on May 10, 1988 for $160,000 or a unit price of $200,000 an acre. After making adjustments for time (market conditions at the time of the sale as compared to market conditions as of the relevant assessment date), location and size, plaintiffs expert concluded that a value of $184,000 an acre was appropriate, and accordingly, assigned values to each of the lots based on that unit value. Specifically, since every lot in section I was different in size, he multiplied his estimated value of $184,000 an acre by the specific lot size. The aggregate value estimated by plaintiffs expert for the 48 lots was $5,471,700.
With regard to section II, the 73.592-acre parcel, plaintiffs expert employed three sales of large vacant land parcels in Morris Township. The first was a sale of 58.66 acres which took place in November 1985 for a sales price of $5,255,430 or a unit price of $89,588 an acre. The second sale was the sale of the subject consisting of 109.858 acres which, as previously noted, was consummated on March 5, 1986 for $7,000,000 or a unit price of $63,723 an acre. The third sale was a 72.44-acre parcel which took place in September 1987 for $6,485,000 or a unit price of $89,524 an acre.
After adjustments for time or market conditions, size, zoning and physical characteristics, and giving the greatest weight in his analysis to his second sale, because it was a sale that involved the subject property, plaintiffs expert estimated the value of the 73.592-acre parcel at $72,000 an acre or a total of $5,298,600 (rounded). When added to his aggregate value for the 48 lots in section I, it produced a total value estimate of $10,770,300, considerably less than the challenged aggregate assessment of $18,117,900 set by the tax assessor for the revaluation year of 1988.
*114 By contrast, defendant’s appraisal expert concluded an aggregate value of $18,360,000. The township’s expert employed nine sales of land that had either preliminary or final subdivision approval for a specified number of lots at the time of sale. He employed these sales because he believed that, first, preliminary or final subdivision approval has a definite value influence, and second, it was his opinion that use of a unit of comparison based on price per lot as opposed to price per acre would produce the most reliable value indication for the subject property in its entirety.
These sales produced an unadjusted range of unit prices of $78,000 a lot to $340,000 a lot. After making adjustments to these unit prices for time or market conditions, location, density of zoning and the status of subdivision approval (preliminary or final) at the time of sale, his unit prices ranged from $121,210 a lot to $170,000 a lot. He then eliminated the high and low ends to narrow his adjusted range to $124,468 a lot to $146,781 a lot. Giving the greatest weight to the sales that occurred outside of Morris Township, apparently because these required the fewest adjustments, his unit price range was further narrowed to $124,468 a lot to $132,500 a lot. He then selected $127,500 a lot as being indicative of market value for the subject.
This value estimate produced an aggregate valuation of $18,-360,000 (144 lots at $127,500 a lot). Defendant’s expert noted that final subdivision approval had only been granted for 48 lots in section I and there was only preliminary subdivision approval for the 96 lots in section II, but he ascribed equal value to all on the basis that there was no market data available to demonstrate a higher unit value to lots with final approval. Additionally, it was his opinion that a purchaser of a large subdivision would expect to obtain a large number of lots (here, a total of 144) at a discounted price, but there was no market data to support this conclusion. He believed, however, that the two adjustments would offset each other and his valuation of $127,500 a lot was appropriate.
*115 Although defendant’s expert considered the sale of the subject, he did not include it in his sales analysis because it had not received either preliminary or final approval for a major subdivision at the time of sale. Thus, it was his view that it was not comparable.
At the conclusion of the trial, I asked counsel to provide, and have received, post-trial memoranda on the question of the proper unit of comparison to be used in valuing the subject property. Plaintiff contends that a per-acre unit of value as employed by its expert was the appropriate common denominator for value analysis, while defendant, relying on the Tax Court opinion in Plushanski v. Union Tp., 1 N.J.Tax 520, 524-527 (Tax Ct.1980) (accepting a homesite approach to valuation), maintains that its expert’s use of a per-lot unit of comparison more readily reflects the action of the market.
In the abstract, both parties could be right. It depends on the nature of the property and the market data available. Units of comparison, according to The Appraisal of Real Estate, are needed in a direct sales comparison because comparison of sale properties with the subject property is not normally feasible unless the properties are reduced to some common denominator, such as price per-square-foot, per room, per-acre or per-site or lot. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 315-316. It would appear that any unit of comparison can be a common denominator if it identifies, clarifies and tends to represent market behavior. Ibid. The per-acre unit of comparison is helpful because it permits adjustments for differences in size. The per-lot unit of comparison, on the other hand, can be used “when the market does not indicate a significant difference in lot value even where there is a difference in lot size.” International Association of Assessing Officers, Property Assessment Valuation (1977) at 86.
The difficulty here, however, is not with the unit of comparison employed by defendant’s expert as a theoretical concept. If the market data demonstrates that sites or lots are actually *116 employed by buyers and sellers as common denominators in the relevant market then the per-site or per-lot unit of comparison is appropriate.[4] The difficulty here is with the sales data relied upon by defendant’s expert. The lots involved in the nine sales used by defendant’s expert ranged in size from .75 acres to three acres. Although the expert made a subjective adjustment for zoning density, he made no adjustment for the differences in lot sizes as compared to the subject which, as previously stated, had a typical lot size of .57 acres.
Even his sale number six, to which he gave substantial weight in his analysis and was closest in lot size to the subject, had a difference of approximately 31.6% in lot size as compared to the subject (.75 acres compared to .57 acres).[5]
Absent some market evidence demonstrating that prospective lot purchasers are unconcerned about size differentials, it is unreasonable to believe that variations in lot sizes do not have significant or measurable influences on value.[6]
*117 The fact, however, that I do not accept the analytical technique[7] employed by defendant’s expert does not resolve this matter. Defendant points to the deficiencies it perceives in the sales comparison analysis employed by plaintiff’s appraisal expert and contends that the presumption of correctness of the original assessments has not been overcome, and therefore, the existing assessments must be sustained.
Before I discuss the alleged deficiencies in the value estimate of plaintiff’s expert, a word concerning the applicability of the presumption of correctness in this case is in order. In Pantasote Co. v. Passaic, 100 N.J. 408, 416-417, 495 A.2d 1308 (1985) our Supreme Court noted that an assessment made by the proper authority is presumed to be correct and the taxpayer has the burden to show otherwise by cogent evidence. There are, however, two exceptions. The amount of the assessment loses the protective presumption of validity if the evidence *118 demonstrates that it was either: (1) “derived from a patently arbitrary and capricious assessment methodology,” or (2) “totally unrelated to true value.” Id. at 417, 495 A.2d 408; see also Transcontinental Gas v. Bernards Tp., 111 N.J. 507, 517, 545 A.2d 746 (1988).
In either event it becomes the duty of this court to depart from the presumption of correctness and independently determine true value. Ibid. It is my view that the evidence in this case demonstrates to my satisfaction that the aggregate assessment of $18,117,900 for the parcels in question is simply unrelated to fair market value as of the assessment date at issue.
To begin with, there is no disagreement that the sale to plaintiff of the subject property for $7,000,000 on October 21, 1985 was a bona fide, arms-length transaction which fairly reflected value as of the contract date. Defendant’s expert rejected this sale from consideration for two reasons. First, an adjustment for time or market conditions would be required, and second, the property did not enjoy either preliminary or final subdivision approval at the time of sale. Both of these factors were perceived as having a significant affect on the market value of the subject.
I agree with the conclusion that these two factors did, in fact, affect the fair market value of the property. The record, however, does not explain how the property, which was indisputably worth $7,000,000 on October 21, 1985, had a market value (according to the assessments) of $18,117,900, an increase of 159%, on October 1, 1987.
On cross-examination, defendant’s expert stated that, in his opinion, property values in Morris Township, based on his paired-sales analysis, had increased from October 1985 to the assessment date in question by 36.6%. Applying that rate of appreciation or adjustment for time would increase the value of the subject to $9,562,000 ($7,000,000 X 1.366 = $9,562,000). Thus, as of the appropriate assessment date, the subject was *119 worth $9,562,000 without, however, any preliminary or final approval for a major subdivision.
The question that quickly comes to mind is: does obtaining preliminary subdivision approval for 96 lots and final subdivision approval for 48 lots increase the value of the entire parcel by $8,555,900 or approximately 90%? Absent some substantial risks and difficulty in obtaining the necessary approvals, it is not likely. The record demonstrates that the property was zoned RA-25 (single-family residential district) at the time of plaintiffs purchase. Further, plaintiff had anticipated securing approval for subdivision into 148 lots pursuant to the zoning ordinance because no changes in zoning were needed and no variances or deviations from the bulk regulations of the zoning ordinance were required. It appears that the only uncertainty was the actual cost of securing preliminary subdivision approval.
Plaintiff ultimately secured preliminary approval for a 144-lot subdivision — just about what it had anticipated — and then obtained final approval for 48 of those lots.
Can the costs of securing such approvals for engineering studies, legal fees and other associated costs nearly double the value of the subject property? [8]
Although defendant’s expert did not have specific cost estimates, he indicated on cross-examination that $100,000 seemed a reasonable cost figure to secure the necessary approvals. That would bring the putative value of the subject to $9,662,000 *120 ($7,000,000 X 1.366 for appreciation = $9,562,000 + $100,000 = $9,662,000) — still a far cry from assessments totalling $18,117,-900. Since the record reveals that, at the assessment date, there was minimal site preparation, the only items left to consider would be the cost of capital, i.e., a charge for the use of funds expended during the 23-month period between October 21, 1985 and the assessment date of October 1, 1987, real estate taxes paid during the period and entrepreneurial profit or the reasonable profit that a typical developer would seek for the risks and efforts required by a developmental project. See The Appraisal of Real Estate, supra at 304-306. A reasonable charge for the cost of the capital investment during the applicable period would have been 10% a year. See the interest rates reflected in The Appraiser for the period in question. That would produce a cost of capital of approximately $1,400,000 ($7,000,000 x 10% = $700,000 x 2 years). The real estate taxes at issue for tax year 1988 were set at approximately $194,-000. Thus, accepting real estate taxes at that level for the two-year period would produce an additional $388,000.[9] Adding those costs to the sum of $9,662,000 would produce a total of $11,450,000 ($9,662,000 + $1,400,000 + $388,000 = $11,450,-000).
The last item to consider would be entrepreneurial profit. Such a profit was estimated at 10% in Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481, 534-535 (Tax Ct.1983), and Twin Oaks Assoc, v. Morristown, 9 N.J.Tax 386, 397 (Tax Ct.1987), aff’d o.b. per curiam 11 N.J.Tax 94 (App.Div.1989), certif. den. 117 N.J. 155, 564 A.2d 875 (1989) for projects that involved greater risks and effort than were displayed in this case by plaintiff.
Assuming arguendo, that 10% would be appropriate in this case, such a percentage for entrepreneurial profit would bring *121 the putative value of the subject to $12,595,000 ($11,450,000 x 1.10 = $12,595,000) — a figure that is still $5,522,900 less than the aggregate assessment of $18,117,900. How does one account for the difference? The record does not. I cannot. This exercise was engaged in — not to establish value — but rather to demonstrate the fact that the assessment in the aggregate is simply not related to fair market value, and thus, must lose the protective presumption of validity. Pantasote Co. v. Passaic, supra.
Inasmuch as the assessments are not entitled to the protective presumption of validity, it becomes the duty of this court “to apply its own judgment to [the] valuation data submitted by [the] experts in order to arrive at a true value and find an assessment for the [year] in question.” Glen Wall Assoc, v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985) (quoting New Cumberland Corp. v. Roselle, 3 N.J.Tax 345, 353 (Tax Ct.1981)).
As previously noted, plaintiff’s expert believed that the 48 lots in section I, which had final subdivision approval, should be valued as though they were ready for development or as finished building lots, and thus, utilized three sales of finished building lots in order to make a sales comparison. Based on these sales he concluded that a value of $184,000 an acre would be appropriate and this unit value should then be proportionately applied to each of the 48 lots. Defendant argues that one of the sales upon which plaintiff’s expert relied (sale number three) was nothing more than a paper transaction between related corporations and was not an arms-length indication of fair market value. Without an explanation by plaintiff’s expert, I find the objection well-founded, and thus, that sale will not be considered. Yet, there are two additional sales upon which plaintiff’s expert relied which do not suffer from the same deficiency.
With regard to these sales, defendant maintains that the location of the sale properties was inferior to the subject, and thus, these properties were not comparable to the subject lots, *122 and additionally, the adjustment for time or market conditions by plaintiff’s expert was inadequate. I conclude that the explanation offered by plaintiff’s expert for the location adjustments, although largely based on subjective judgment and experience, were appropriate. I am not in agreement, however, with that expert’s adjustment for time and will accept the time adjustment offered by defendant’s expert based on the fact that he conducted a paired-sales analysis to extract a rate of increase of 1.4% a month from October 1985 to June 1986 and 2% a month from July 1986 to July 1987.
Accepting the adjustments made by plaintiff’s expert for location and size and accepting the time adjustment suggested by defendant’s expert produces a value range of the two sales of $220,000 (rounded) an acre to $160,500 (rounded) an acre. I conclude that $200,000 an acre represents a fair market unit value for the 48 lots in section I. That value will be ascribed to the individual lots in section I proportionately as is shown in the schedule attached hereto. In the aggregate, the assessment of section I will be:
[[Image here]]
With regard to section II, plaintiff’s expert viewed this 73.592-acre parcel as raw acreage and relied upon three sales of relatively large parcels of acreage to estimate the value of the tract comprising section II. Defendant maintains that the sales employed by plaintiff's expert were not comparable, even though sale number two of plaintiff’s expert included the subject property. Specifically, defendant argued that sales numbers one and three were not comparable because the zoning was entirely different. The comparable sale properties were zoned for multi-family development whereas the subject was zoned for single-family residences.
Defendant contended that plaintiff’s sale number two, which as previously noted, was the sale of the subject when it consist *123 ed of 109.858 acres, was not comparable because the sale took place 23 months prior to the relevant assessment date, and second, the subject was not approved for either preliminary or final subdivision at the time of the sale. Defendant’s argument with regard to the difference in zoning relative to plaintiff’s sales numbers one and three may have some merit. However, there seems to be no justifiable reason for ignoring the sale of the subject property. Defendant’s expert readily admitted that an adjustment for time or market conditions could be made to cover the period from October 1985 to the assessment date of October 1, 1987 at approximately 36.6%. The only additional adjustments that would be necessary would be for size, physical characteristics and preliminary subdivision approval.
The adjustments made by plaintiff’s expert for size and physical characteristics, also, based essentially on his subjective judgment and experience, appeared to be reasonable and were not seriously challenged by defendant. Therefore, I accept those adjustments to plaintiff’s second sale, i.e., the sale of the subject comprising 109.858 acres. Plaintiff’s expert did not make an adjustment for the preliminary subdivision approval which the 73.592-acre tract enjoyed at the assessment date but not at the time of sale. I find that an adjustment for the developmental status of section II as of the assessment date is necessary to an appropriate valuation of this tract.
Inasmuch as defendant’s expert did not seriously question the sum of $100,000 as the aggregate cost which would be necessary to secure approval for a preliminary subdivision, that sum will be added as an additional adjustment to plaintiff’s consideration of the sale of the subject by its expert.
Additionally, plaintiff’s expert made no allowance for entrepreneurial profit as of the assessment date for the 73.852-acre tract. Experience demonstrates that a developer would not undertake a developmental project without adequate compensation as an inducement to organize the project. Such a profit is necessary to compensate the prudent investor for the inherent risks and hazards. I find that 10% would be an appropriate *124 inducement in this case, and therefore, that sum will be added as an additional adjustment to sale number two of plaintiff’s expert. See Lawrence Associates v. Lawrence Tp., supra, 5 N.J.Tax at 534-535, and Twin Oaks Assoc. v. Morristown, supra, 9 N.J.Tax at 397, in which the Tax Court estimated entrepreneurial profit at 10%; see also Glen Pointe Assocs. v. Teaneck Tp., 10 N.J.Tax 506, 515-516 (Tax Ct.1989). These adjustments produce the following calculations:
[[Image here]]
Thus, the assessment for tax year 1988 for Block 246, Lot 52c will be:
*125 [[Image here]]
As previously noted, the aggregate assessment for section I as determined by this court for 1988 is $5,915,200 which when added to the $6,627,800 assessment for the 73.592-acre tract (Block 246, Lot 52c) the total becomes $12,543,000.
The Clerk of the Tax Court is directed to enter judgments for tax year 1988 in accordance with the attached schedule.
[[Image here]]
*126 [[Image here]]

 There were actually 49 lots in the subdivision of section I. Plaintiff's challenge to the assessment of the lot known as Block 246G, Lot 1 which was designated for storm drainage was withdrawn at the outset of the proceeding.

 Defendant’s appraisal expert had been the tax assessor for Morris Township for approximately 12 years up to 1986. Thereafter, he worked as a parttime assessor for the township until 1988. The record reveals that he certified the tax assessments for the subject property for tax year 1988.

 There was an improvement (apparently a model of some sort) assessed at 575,000 located on Block 246H, Lot 1. Plaintiff did not challenge that assessment.

 Plaintiffs expert conceded that he could have used a per-lot unit of comparison if he had sales of acreage that had subdivision approval for a particular number of lots, "if the lots were of similar size" to the subject. It was the opinion of plaintiffs expert that residential developers know that lot size makes a difference to the typical home buyer, and therefore, developers are controlled by that consideration.

 Comparable sale property number six of defendant’s expert also contained a considerable amount of open space to which no consideration was given in the expert's comparative analysis. Moreover, defendant’s expert made no analysis of the costs which would be necessary to physically develop either the 73.592 acres of the subject or any of his comparable sale properties. These costs vary in each development and are carefully considered by developers who reflect such consideration in the prices they will pay for land that has approval for a major subdivision but remains physically undeveloped.

 Simply put, it is not reasonable to assume that a prospective purchaser will view a '/2-acre building lot as being equal in value to a one-acre or two-acre lot, unless, of course, there is market data that demonstrates that is, in fact, the case. There was no such evidence in this proceeding.
Defendant’s appraisal expert justified his conclusion that differences in lot sizes would not matter much in a value analysis on the basis that the prospective purchaser for the subject would be a developer who would be interested in the entire tract instead of individual purchasers of single lots. *117 The expert believed that developers are only interested in lot yield and not lot size. This ignores the fact, however, that the developer will be selling ultimately to a single lot purchaser who would be concerned with lot size. Any prudent developer would, of necessity, be cognizant of the preferences of those who would be buying individual lots.

 In addition to a failure to account for differences in lot sizes of the alleged comparable sale properties and the subject, defendant's expert also employed a deficient technique of eliminating the sales prices at the extremes of his range of sales prices. Either of the eliminated sales may have had a greater degree of similarity to the subject property than those reflected by a narrower band of sales prices. Absent adequate explanation, this procedure amounts to no more than an averaging process which is a dubious technique at best. To treat all vacant land as fungible and to seek to reduce the disparity in prices by the elimination of range extremes does not constitute a reliable approach to the fair market value of the subject. What is required is an examination of the sales of comparable properties and the utilization of sound judgment with respect to the relevant value factors such as time, location, physical characteristics, utility and desirability.
Defendant’s expert also failed to adequately explain why finished lots fronting on an existing street ready for building would not have a greater value than planned lots in a preliminary subdivision which still required the installation of roads, curbs, sidewalks and utilities. These additional deficiencies lend greater weight to the conclusion that defendant's sales comparison approach should be rejected.

 Defendant argues that preliminary and final subdivision approval adds substantially to value and points to sales numbers five and six of its appraisal expert for support of that proposition. The subject of sale number five sold for $702,000 without approval and then sold again for $1,375,000 with approval or a difference of 95.9%. The subject of sale number six sold for $2,086,000 without approval and subsequently for $6,500,000 with approval or a difference of 212.5%. The difficulty is that defendant’s expert did not do an analysis of the resales or did not include it in the record. There is no way to determine what was required for the approvals. Were zoning changes required? Were variances necessary? Either of these could account for large variations in property value. Neither was necessary for the development of the subject.

 The actual taxes for 1988 were employed for the purpose of the exercise even though the end result demonstrates that the tax figure for the two-year period between October 21, 1985 and October 1, 1987 should be considerably lower.