NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone 609.815.2922 x54630
TeleFax:  609.376.3018
taxcourttrenton2@judiciary.state.nj.us

July 26, 2017

Pablo Kim, Esq.
Amber Heinze, Esq.
The Irwin Law Firm
80 Main Street, Suite 410
West Orange, New Jersey 07052

Frederick Raffetto, Esq.
Ansell Grimm & Aaron, P.C.
1500 Lawrence Avenue
Ocean, New Jersey 07712

Re:    9 Plaza Court L.L.C. v. City of Long Branch
Block 60, Lot 6
Docket Nos. 002745-2011, 000693-2012, 016991-2012, 001046-2013, 000770-2014

Dear Counsel:

This is the court's opinion following trial in the above captioned matters.  Plaintiff[1] contests the local property tax assessments on the above captioned property ("Subject") for the above tax years which include an added assessment for tax year 2012.  The issue parsed during trial was the value of the Subject's site (i.e., land value) for all tax years at issue.  For the reasons set forth below, the court affirms the assessments for all years at issue.

---

[1] Plaintiff is a single-member entity owned by Mrs. Shalom.  Isaac Shalom, her husband, testified as a fact witness.

*

**FACTS**

The Subject is located in the affluent Elberon section of defendant ("City"). Per plaintiff's expert's report, the area used to be a famed beach resort area, and currently has well-maintained single-family dwellings on landscaped lots. Marketability of the area has been favorable although the expert claims that oceanfront properties have suffered stigma due to recent storms.

The Subject is an oceanfront site measuring 19,562 square feet ("SF") and zoned for residential use. The ocean side (eastward measuring about 120 feet) had a bulkhead owned by the City.

In April 2006, plaintiff purchased the Subject as a vacant lot for $4,300,000. Plaintiff's sole owner (wife[2]) and her husband had owned another home in the Elberon section of the City, and purchased the Subject due to ocean proximity and presence of their religious community, friends, and family. Mr. Shalom (husband who is involved in property management and commercial realty buy/sell transactions) testified that he tracked down the property owner and offered to purchase the same. The couple intended to, and used, the Subject as their summer home. Mr. Shalom applied for and received a bulk variance in June of 2006 to build a single-family residence. The variance was for lot depth (since the ordinance required 175 feet and the Subject's depth was 120 feet), rear yard and driveway setbacks, and lot coverage. Mr. Shalom stated that he considered Deal, Loch Arbor, and Allenhurst as comparable neighborhoods for oceanfront properties. He agreed that he would not purchase a home in Manasquan or Bayhead, nor Spring Lake or Sea Girt due to lack of his community and friends.

Plaintiff commenced construction of a single-family residence in summer of 2010 after entering into a building loan agreement with a bank for $3,916,056. According to Mr. Shalom,

---

[2] However, on the mortgage for the Subject, the signatory for plaintiff, who was stated to be the sole member, was not the wife.

2

the time-gap since the 2006 purchase was due to the market crash in 2008. Hurricane Irene damaged the Subject during its construction in August of 2011. Plaintiff then began repairing and constructing the Subject. Construction was complete in July of 2012, at which time the City issued a temporary certificate of occupancy. The home comprised of 5,124 SF of gross living area ("GLA") per plaintiff's expert who inspected the Subject in August 2014, and 5,570 SF ("luxury oceanfront residence") per the City's expert who inspected the Subject in September 2015.

Hurricane Sandy damaged the Subject on October 27, 2012. Although Sandy did minor damage to the second floor of the home where bedrooms and four full baths were located, it rendered the entire first floor (including the kitchen) uninhabitable. The Subject site was deemed unsafe in the aftermath of Sandy and thus could not be immediately boarded up. The Subject was then vandalized. Post-Sandy, plaintiff had to obtain another variance as to building height because the zoning now deemed the Subject to be in a flood hazard zone, and required the home to be raised on pilings. The Subject was therefore raised on pilings, with the former second floor reconfigured as the first floor, and the new third floor as the former second floor. The former first floor is now used to house utilities and the HVAC system.

The home was completed only in September 2015. It has an in-ground concrete pool with mosaic tiles, attached sandstone patio, and a concrete driveway with access for five automobiles. Windows are floor-to-ceiling, tinted and insulated, and slider doors are also floor-to-ceiling and tinted.

**ASSESSMENTS**

For each tax year, the City imposed the following assessments:

| Tax Year | Assessment | Average Ratio | Implied Value |
|---|---|---|---|
| 2011 | $3,586,900 | 85% | $4,219,882 |
| 2012 | $3,586,900 | 87.91% | $4,080,195 |
| 2012 (Added) | $ 969,000 | | |

| | | | |
|---|---|---|---|
| 2013 | $4,212,100 | 90.6% | $4,649,117 |
| 2014 | $4,212,100 | 92.5% | $4,536,216 |

For each of these tax years, the value allocated to land was $3,573,600. For tax years 2011 and 2012, the value allocated to improvements was $13,300. After the added assessment in 2012, the value allocated to improvements for tax years 2013 and 2014 was $638,500.

## PARTIES' EXPERTS' OPINIONS

Each party presented an appraisal expert witness, whose reports were admitted into evidence without objection. Plaintiff's expert concluded that the highest and best use ("HBU") of the Subject as vacant and as improved was for a single-family residence, and post-Sandy to "repair the property to a single-family residential building." The City's expert concluded the Subject's HBU for tax years 2011 and 2012 (when it was a vacant lot) was for development of a single-family residence. He then concluded the Subject's HBU as of 10/1/2012 "was as a new completed single family residence," and thereafter on 12/31/2012 and 10/1/2013 as "a partially completed residence." Each expert's value conclusion was as follows:

| Tax Year | Plaintiff's Expert | City's Expert |
|---|---|---|
| 2011 | $2,800,000 | $4,500,000 |
| 2012 | $2,800,000 | $4,500,000 |
| 2012 (AA) | $1,334,800 | |
| 2013 | | $7,629,000(as of 10/1/12) |
| 2013 | $3,400,000(as of 1/10/13) | $5,368,000(as of 12/31/12) |
| 2014 | $3,450,000 | $5,368,000 |

During trial, plaintiff conceded that it was not challenging the valuation aspect of the 2012 added assessment.

### *Tax Years 2011 and 2012*

Each expert's value conclusion was as to land only. Plaintiff's expert used three sales, all of which were oceanfront and one outside the City. She converted the sale prices to a per SF

4

("PSF") value, made adjustments thereto, concluded a value of land PSF, and multiplied the same with the Subject's total SF. The comparables' details were as follows:

| Sale | Address | Date | Size (SF) | Price | Price PSF | Net Adj.[3] | Net PSF |
|------|---------|------|-----------|-------|-----------|---------|---------|
| 1 | 6 Adams St, Long Branch | 12/14/2011 | 39,150 | $5,000,000 | $127.71 | 5% | $134.10 |
| 2 | 10 Plaza Ct, Long Branch | 11/03/2011 | 36,720 | $5,342,122 | $145.48 | 2% | $148.38 |
| 3 | 627 East Ave, Bayhead | 01/28/2010 | 34,560 | $4,950,000 | $143.00 | 6% | $151.58 |

Land value for Sale 2 (next door to the Subject) was an extracted amount. She used a bank appraisal which had appraised the property for $5,000,000, her knowledge due to personal inspection ("excellent condition" when inspected in 2011), and cost estimates from Marshall & Swift data to compute the improvement's value (less 33% depreciation, 10% entrepreneurial profit) at $662,878. This provided an extracted land value of $5,337,122. To this, she added $5,000 for bulkhead for a total extracted land value of $5,342,122. She confirmed the arms-length nature of Sale 3, an estate sale (designated as NU-10), with the attorney that it was marketed for a length of time and received several offers. She deemed its location comparable though 20 miles south of the Subject, since Bayhead has a superior school district and neighborhood. Placing 40% weight to Sale 1 and 30% weight each to Sales 2 and 3, she concluded a PSF value for the Subject's site at $143, for a value conclusion of $2,800,000 (Subject's SF times $143).

The City's expert used seven sales, one of which was the Subject's sale, two of which were used by plaintiff's expert (6 Adams Street and 10 Plaza Court), and all of which were oceanfront properties located in the City, as follows:

| Sale | Address | Date | Size (SF) | Price | Price PSF | Net Adj.[4] | Net Price |
|------|---------|------|-----------|-------|-----------|---------|-----------|

---

[3] The adjustments were for: (1) lot size based on economies of scale (5% to 6%); (2) "depth" of the lot being the area farther away from the ocean not as valuable as land area most proximate to the ocean (3% to 6%); (3) ocean "frontage" (-5% ; -7%; 5%); and (4) location for Sale 3 at -10% since she considered Bay Head to be superior to Elberon.

[4] The adjustments were for: (1) lot size based on $60 PSF based on the price difference between Sales 4 and 5, and Sale 6 (largest lot) of about $3,100,000 divided by the average area difference of 54,250 SF; (2) market conditions for

5

| 1 | 6 Adams Street | 12/14/2011 | 38,400 | $5,000,000 | $130.21 | -20% | $4,000,000 |
|---|---|---|---|---|---|---|---|
| 2 | 907 Ocean Ave | 07/02/2013 | 74,250 | $7,600,000 | $130.21 | -40% | $4,580,000 |
| 3 | 12 Pullman Ave | 06/01/2014 | 31,930 | $4,600,000 | $144.00 | 0% | $4,600,000 |
| 4 | 11 Pullman Ave | 08/07/2006 | 22,010 | $3,500,000 | $159.01 | 25% | $4,410,000 |
| 5 | Subject | 04/07/2006 | 19,562 | $4,300,000 | $219.81 | 5% | $4,515,000 |
| 6 | 907 Ocean Ave | 01/31/2006 | 74,250 | $7,000,000 | $94.98 | -35% | $4,410,000 |
| 7 | 10 Plaza Ct | 11/03/2011 | 34,000 | $5,350,000 | $157.31 | -15% | $5,547,500 |

The expert used all sales even if remote to the assessment dates since sales of competitive oceanfront sites were "extremely limited." All seven sales were within a 2-block radius of the Subject. He used a buildable lot as the unit of comparison noting that zoning allowed a lot of 17,500 SF for building a home, and the Subject itself, about ±2,000 SF larger, was approved for construction of a ±5,400 SF residence with an in-ground pool. The expert noted that the lot dimensions, beach accessibility, and elevation are considerations for buyers of oceanfront lots. He concluded a land value of $4,500,000.

*Tax Year 2013*

Plaintiff's expert concluded a value as of January 1, 2013 due to Sandy damage using both the market and cost approach. Under the market approach she used four sales of improved properties only one of which was in the City, as follows:

| Sale | Address | Date | Size (SF) | Price | Net Adj. |
|---|---|---|---|---|---|
| 1 | 10 Plaza Ct, Long Branch | 11/03/2011 | 36,720 | $6,000,000 | -44% |
| 2 | 1A Elberon Ave, Allenhurst | 01/14/2013 | 24,030 | $6,701,300 | -33% |
| 3 | 39 Beachfront, Manasquan | 06/14/2013 | 34,560 | $3,000,000 | -14% |
| 4 | 611 Ocean Ave, Sea Girt | 10/18/2011 | 12,500 | $5,250,000 | -20% |

the 2006 sales at 5% based on the price difference between the paired Sales 2 and 6; and, (3) inferior utility for Sale 3 which had 60 feet width-wise of buildable area, and the remaining on a 10-foot slope to the beach.

Sales 2 and 3 were marked as NU-26, and she noted after speaking to an attorney, Sale 3 was arms-length. She maintained that all the other taxing districts were equal, if not superior, to the City, and thus comparable, even if they fronted a public-access boardwalk. She placed a weight of 35% to Sale 1, 15% to Sale 4, and 25% to each Sales 3 and 4 and concluded a value of $3,500,000.[5]

Under the cost approach, her value conclusion for land was $2,600,000. She used four land sales (two of which were used in earlier tax years), and one of which was located in another township, Monmouth Beach. The details are as follows:

| Sale | Address | Date | Size (SF) | Price | Price PSF | Adj.[6] | Net PSF |
|---|---|---|---|---|---|---|---|
| 1 | 6 Adams St | 12/14/11 | 39,150 | $5,000,000 | $127.71 | 9% | $132.25 |
| 2 | 907 Ocean Ave | 01/31/06 | 74,250 | $7,000,000 | $94.98 | 29% | $132.04 |
| 3 | 10 Plaza Ct | 11/03/11 | 36,720 | $5,337,122[7] | $145.48 | 4% | $143.62 |
| 4 | 7 Ocean, Monmouth Beach | 05/28/13 | 11,612 | $1,260,000 | $108.50 | 7% | $116.10 |

Placing 30% weight to Sales 1 and 2, 25% to Sale 3, and 15% to Sale 4, she concluded a PSF value for the Subject's site at $133 for a land value conclusion of $2,600,000 (Subject's SF times $133). This plus the improvement value of $798,406 (a figure parties stipulated to during trial), provided a value of $3,398,406. Her reconciled value conclusion was $3,400,000.

The City's expert used only the cost approach. He first valued the Subject as of October 1, 2012 since the house was completed as of July 2012 at $7,629,000 (land value $4,500,000, improvement value $3,128,760). The vacant land sales were those he had used for tax years 2010

[5] The adjustments were for: (1) market conditions based on a paired sales analysis of a property in Deal, a neighboring township which sold May 2006 for $5,300,000 and then in April 2013 for $3,200,000 thus, indicating a value decrease of 39.6% over an 8-year period; (2) lot size; (3) location; (4) age; (5) condition (the Subject being "partially destroyed" consequently each comparable being "excellent" in comparison); (6) GLA using the Subject's GLA as 2,327 SF due to Sandy damage; (7) bedroom/bathroom count; (8) basement; (9) basement finish; (10) garage; (11) design appeal; (12) fireplace; (13) pool; and (14) amenities.
[6] She made the same adjustments as in prior tax years. See supra n.3.
[7] The expert apparently did not add the $5,000 she had attributed for the bulkhead for tax years 2011 and 2012.

7

and 2011 (with the same type of adjustments).  He then also concluded a value as of December 31, 2012 due to Sandy damage to the improvements.  There was no change to his vacant land comparables, adjustments, and value conclusion of $4,500,000.  This when added to the agreed to improvement value of $798,406 provided a value conclusion of $5,298,406.

*Tax Year 2014*

The experts agreed that the improvements were not yet fully repaired and/or restored from Sandy damage.  Under the market approach, plaintiff's expert used three of the sales she had used for tax year 2013 with the same type of adjustments as in prior years (except for an increased lot size adjustment for Sale 3), as follows:

| Sale | Address | Date | Size (SF) | Price | Net Adj. |
|------|---------|------|-----------|-------|----------|
| 1 | 10 Plaza Ct, Long Branch | 11/03/2011 | 36,720 | $6,000,000 | -44% |
| 2 | 1A Elberon Ave, Allenhurst | 01/14/2013 | 24,030 | $6,701,300 | -33% |
| 3 | 39 Beachfront, Manasquan | 06/14/2013 | 34,560 | $3,000,000 | -12% |

Placing 40% weight to Sale 1 and 30% to Sales 2 and 3 each, she concluded a value of $3,465,000.

Under the cost approach, her value conclusion for land was $2,700,000.  She used the same four land sales she had used for tax year 2013, with the same type of adjustments as in prior years, and one more located in the City as follows:

| Sale | Address | Date | Size (SF) | Price | Price PSF | Net Adj. | Net PSF |
|------|---------|------|-----------|-------|-----------|----------|---------|
| 1 | 6 Adams St | 12/14/11 | 39,150 | $5,000,000 | $127.71 | 9% | $132.25 |
| 2 | 907 Ocean Ave | 01/31/06 | 74,250 | $7,000,000 | $94.98 | 29% | $132.04 |
| 3 | 10 Plaza Ct | 11/03/11 | 36,720 | $5,337,122 | $145.48 | 4% | $143.62 |
| 4 | 7 Ocean, Monmouth Beach | 05/28/13 | 11,612 | $1,260,000 | $108.50 | 7% | $116.10 |
| 5 | 12 Pullman Ave | 06/01/14 | 29,605 | $4,570,000 | $154.36 | 9% | $169.36 |

Placing 25% weight to Sales 1 to 3, 12% to Sale 4, and 15% to Sale 5, she concluded a PSF value for the Subject's site at $138 for a land value conclusion of $2,700,000 (Subject's SF times $138).

8

This plus the settled upon improvement value of $798,406 provided a value of $3,498,406. Her reconciled value conclusion was $3,450,000.

The City's expert used only the cost approach, and using the same seven vacant land sales (and type of adjustments), arrived at the same value conclusion for land at $4,500,000. This when added to the agreed to improvement value of $798,406, yielded a value conclusion of $5,298,406.

## ANALYSIS

*(A)  Standard of Review*

A complainant carries a dual burden: first of overcoming an assessment's presumptive correctness, and thereafter, persuading the court what the correct value of the property should be. MSGW Real Estate Fund, L.L.C. v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373, 377 (Tax 1998); Ford Motor Co. v. Township of Edison, 127 N.J. 290, 314-15 (1992), aff'g, 10 N.J. Tax 153 (Tax 1998). If the court finds that plaintiff has failed to overcome the presumptive correctness of the assessment, and the taxing district makes no claim for assessment adjustment (either as a counterclaim or through evidence), the court can affirm the assessment. MSGW, supra, 18 N.J. Tax at 378-79. "[A]n expert should fully document his opinion," thus, an expert's opinion that is "unsubstantiated" merits no attention. Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 280 (1985); see also MSGW, supra, 18 N.J. Tax at 376 ("plaintiff must present evidence sufficient to demonstrate that the appeal is based on sound theory and objective data rather than on mere wishful thinking.").

The court finds the plaintiff has overcome the presumptive correctness of the assessments by providing evidence from an expert, who used acceptable valuation methods to provide a value conclusion. The court will therefore examine all evidence before it.

9

The City's expert's value conclusion of the Subject as of October 1, 2012 will not be considered. Due to the undisputed material destruction of the Subject and undisputed timely notification thereof to the assessor, the valuation date for tax year 2013 would be as of January 1 of the tax year. See N.J.S.A. 54:4-35.1.

Plaintiff's expert's value conclusions under the sales comparison (or market) approach for tax years in which the Subject's improvements were partially destroyed are not credible. Questionable were her choice of some of the comparables which were located in municipalities dissimilar to the Subject's location, for instance in Manasquan where the comparable was located adjacent to a public boardwalk. Mr. Shalom also stated that he would not consider purchasing a home in Bayhead or Manasquan, and further would not do so in Spring Lake and Sea Girt due to absence of his religious community and family.

More questionable in terms of credibility is comparing a partially destroyed home as the Subject to comparables which were in excellent condition. Although the expert posited that this required a shrinkage of the GLA from about 5,124 SF to 2,327 SF, it was undisputed that the Subject's first floor had been destroyed and deemed unsafe for habitation. There was no kitchen. The expert's report also notes that there was no heating, plumbing, electrical, water, sewer, or phone system. Therefore, comparing a partially destroyed home which was, although structurally erect, inaccessible, unsafe, and non-functional, to homes which were fully functional and habitable, is fundamentally problematic regardless of the large adjustments made for square footage and condition. Although plaintiff's expert's adjustments are based upon Marshall & Swift cost data, here, since the parties agreed to the value of the partially destroyed improvements,

analyzing the viability of plaintiff's expert's adjustments for physical characteristics under the sales approach is not required.[8]

Further, her adjustment for time is not credible. She claimed the market was depreciating from 2006 to 2013 by about 5% each year based on a paired sale analysis of a property in Deal (which sold in May 2006 for $5,500,000 then in April 2013 for $3,200,000). When asked why she did not consider a paired sale that occurred in the City (which sold January 2006 for $7,000,000 and then in July 2013 for $7,600,000) rather than the neighboring town, which indicated the contrary, i.e., market appreciation, she responded, "I guess I missed it." This seems incredible since the expert had used the same property as a comparable in land valuation analysis.

The court will therefore use only the cost approach. Since the parties agreed to the value of the improvements under the cost approach, the only issue is the value of land. Although the experts used some of the same vacant land sales as comparables, they differed significantly in their respective value conclusion. This was due to their respective units of comparison: plaintiff's expert used a PSF measure while the City's expert used a per-lot measure. Other disputes were on adjustments for differences in market conditions and physical characteristics.

*(B) Unit of Comparison*

Plaintiff's expert claimed that using a PSF unit of comparison was more credible because that would capture the value difference of the depth of a lot, since depth makes a significant difference in land values. The City's expert disagreed on grounds it would skew values especially due to economies of scale (larger lots would have a lower PSF price and smaller lots would have a higher PSF price). He maintained that for a residential property, the value on a per-lot or

---

[8] The court notes that plaintiff's expert's adjustments for difference in both bed/bath room count and GLA are duplicative because the Subject's GLA was only of the upper two floors, which consisted of bedrooms and bathrooms. The court also notes that although she used the same Manasquan comparable for both tax years (2013 and 2014), she increased her lot size adjustment by $66,900 for tax year 2014 with no explanation.

buildable lot was more appropriate because almost all vacant lots had surplus land which may or may not have equal value. He noted that the value is to a lot, in that how much of a house could be built on the lot, and in this connection, depth is also important to accommodate amenities such as pools, tennis courts, and basketball courts.

Both experts' land value conclusions were widely disparate: plaintiff's expert valued the land at $2,800,000 (tax years 2010 and 2011), $2,600,000 (tax year 2013), and $2,700,000 (tax year 2014). Whereas the City's expert valued vacant land at $4,500,000 for all tax years at issue (which was even higher than the Subject's purchase price of $4,300,000 in 2006).

When analyzing property, appraisers must compare "like units," therefore, "each sale price should be stated in terms of appropriate units of comparison." Appraisal Institute, The Appraisal of Real Estate, 386 (14th ed. 2013). Units of comparison can differ depending on the "nature of the property." Ibid. Thus, for instance, the "typical" unit for a "single-unit residential property" is either the "total property price" or the "[p]rice [PSF] of gross living area." Ibid. Vacant land could be compared either as a price "per front foot," PSF, "per acre," "per buildable square foot," or "per buildable unit." Ibid.; see also Real Property Appraisal Manual for New Jersey Assessors, I-43 (3d ed. rev'd 2002) ("[t]he unit land value for a standard unit of measurement" can be either "front foot, square foot or acre depending on the type of use" of land); Handbook for New Jersey Assessors, 427 (rev'd Jan. 2016) ("Unit land values provide a simple, uniform measurement of value" and can be either "area units" such as per-acre or PSF, or "front foot units.").

A PSF unit of comparison is generally used "when appraising industrial land." Real Property Appraisal Manual for New Jersey Assessors, supra, at I-43  It is employed where "it is assumed that, within the parcel, every plot or lot of land has the same value regardless of its location," such as farmland or industrial land. Handbook for New Jersey Assessors, supra, at 427.

12

A "front foot unit of measurement is generally used for [platted] residential and commercial parcels." Real Property Appraisal Manual for New Jersey Assessors, supra, at I-43.[9]

However, it is most important that an appraiser select a unit of comparison which is commonly "used by participants in the market," since the goal is to "define and identify a unit of comparison that explains market behavior." Appraisal of Real Estate, supra, at 382. The marketplace thus determines the appropriate unit of comparison. Id. at 387 (an appraiser's decision to use a particular unit of comparison "should only be made after personal verifications have confirmed that market participants use those units of comparison"). As this court has observed:

> [A unit of comparison] depends on the nature of the property and the market data available. Units of comparison . . . are needed in a direct sales comparison because comparison of sale properties with the subject property is not normally feasible unless the properties are reduced to some common denominator, such as price per-square-foot, per room, per-acre or per-site or lot. It would appear that any unit of comparison can be a common denominator if it identifies, clarifies and tends to represent market behavior . . . . The per-acre unit of comparison is helpful because it permits adjustments for differences in size. The per-lot unit of comparison, on the other hand, can be used "when the market does not indicate a significant difference in lot value even where there is a difference in lot size."
>
> [Watnong Assocs. Inc., v. Township of Morris, 11 N.J. Tax 108, 115 (Tax 1990) (citations and quotations omitted), aff'd, 12 N.J. Tax 252 (App. Div. 1991).]

Thus, it is crucial that "market data demonstrates that sites or lots are actually employed by buyers and sellers as common denominators in the relevant market." Id. at 115-16; see also Romulus Dev. Corp. v. Township of Weehawken, 1994 N.J. Tax LEXIS 24 (Tax 1994), aff'd, 15 N.J. Tax 209, 212 (App. Div. 1995) (approving use of buildable units in valuing residential property and buildable square footage for commercial property since "credible evidence" showed

---

[9] A front foot unit is "a piece of land one foot wide fronting on the street and extending back to the standard depth for specific land use classes." Real Property Appraisal Manual for New Jersey Assessors, supra, at I-43. It is used "wherever, within a single parcel, the value of land varies depending on its location on the parcel." Id. at 1-45. The area in front of a residential (or commercial) parcel which has "ready access to the street" is deemed of more value "than the rear portion of the parcel." Ibid.

that "property such as the subject is marketed on the basis of its development potential"); <u>Frieman v. Township of Randolph</u>, 8 <u>N.J. Tax</u> 264, 273 (Tax 1986) ("land sold for multi-family residential use is valued in the market by the number of units that can be constructed on the land"), <u>aff'd</u> 216 <u>N.J. Super</u> 507 (App. Div. 1987), <u>app. dismissed</u>, 110 <u>N.J.</u> 294 (1988).

Here, both experts agreed that the Subject was zoned residential. They agreed that the HBU of the Subject as vacant was for residential single-family use. Thus, a PSF unit of comparison is suspect. The purchase deed for the Subject also does not indicate anywhere that the consideration of $4,300,000 was based on a dollar amount PSF. Mr. Shalom never claimed that his offer to buy the Subject was on a PSF basis. The court is unpersuaded by plaintiff's expert's contention that use of PSF is appropriate because the Tideland Commission typically and routinely uses it as the unit of comparison. It was not established that the Tideland Commission is a typical buyer in a marketplace for residential properties. Plaintiff's expert's basis for using PSF (<u>i.e.</u>, crucial importance of lot depth) is also questionable because when analyzing a depth adjustment she compared <u>lots</u> or <u>parcels</u> by noting that "sites located even one <u>lot</u> in from the beach" are less desirable (emphasis added).

The court finds more credible the City's expert's use of a buildable lot as an appropriate unit of comparison for residential vacant land. It agrees with the expert's opinion that using a PSF unit would skew value for a plot which has surplus land. There was nothing to refute the City's expert confirmation with marketplace peers that a per-lot was the most prevalent unit of measurement used for oceanfront properties. This confirmation is more credible and more persuasive than use of PSF unit by the Tidelands Commission. Therefore, the court agrees with the City's expert that a per-lot or buildable lot unit of comparison is more appropriate.

(C) *Land Value Conclusion*

Initially, the court rejects the City's expert's use of the Subject as a comparable. Although Mr. Shalom is a sophisticated commercial real estate dealer, and thus, not unaware of the ups and downs in the real estate market, it is undisputed that the Subject was never offered for sale on the market. The court is aware that property owners in the Elberon section of the City do not market their properties to the public, thus, are not listed on the Multiple Listing Services. However, here there was no proof that the Subject was even available for sale. Mr. Shalom credibly testified that he had to locate the property owner to make him an offer to buy. As such, it is difficult to accept that the sale was an arms-length one for a property that was exposed to a market, private or otherwise.

Second, the court does not consider the commonly used property (907 Ocean Avenue) as an appropriate comparable due to the sheer size difference (almost four times the Subject's size). See, e.g., Watnong, supra, 11 N.J. Tax at 116 (unless market evidence shows that buyers "are unconcerned about size differentials, it is unreasonable to believe that variations in lot sizes do not have significant or measurable influences on value"); see also Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980) ("Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties so as to admit of reasonable comparison."), aff'd o.b., 4 N.J. Tax 528 (Tax 1981); Appraisal Institute, The Appraisal of Real Estate, 425 (12th ed. 2001) (appraisers should try use comparables "in the same size range as the subject so that economies of scale do not enter into the process," since, for instance, "the per unit price of the larger property may be lowered by economies of scale"). A lot almost four times larger than the Subject would evidently accommodate a significantly larger residence than would a lot the Subject's size. Additionally, it may have more land available to erect sizeable amenities. That

it is located in the same residential zone does not mean that land in excess of what is minimally required under the zoning laws is either excess or surplus.  See, e.g., M. I. Holdings, Inc. v. City of Jersey City, 12 N.J. Tax 129, 137 (Tax 1991) ("land-to-building ratio which appears to be in excess of the land-to-building ratios prevailing in the subject's market area is not necessarily indicative of excess land").  In the absence of any analysis in this connection, the court cannot conclude that the HBU of this comparable is the same as the Subject, i.e., for development as a single-family home.  For all of these reasons, the commonly used sale is not an appropriate comparable.

Third, as to vacant land sale of 10 Plaza Court it appears that plaintiff double counted the bulkhead in extracting land value.  When valuing the improvements for this property via the cost approach under a market extraction method, she provided $128,251 as cost for "two balconies, bulkhead and one fireplace."  Later on, she added $5,000 for the bulkhead.  For tax years 2011 and 2012, the extracted land value was $5,342,122 but for tax years 2013 and 2014 it was $5,337,122.  The court will therefore use $5,337,122.  The City's expert also used this sale and estimated the land value at $5,350,000 to account for estimated demolition costs.  There was no explanation or backup for the demolition estimate.  The court will use plaintiff's expert's extracted number which was based upon cost data.

Fourth are issues relating to adjustments.  Plaintiff's expert's -5% adjustment to the November and December 2011 sales for market conditions is not credible.  Based on a paired sales in Deal, the neighboring Borough, which sold in 2006 for $5,300,000 then in 2013 for $3,200,000, the 40% price decrease allowed for a conclusion of a 5% decline per year (an "extraordinary assumption," since the sale closed in 2013).  However, when questioned why she did not consider the paired sale that occurred in the City (907 Ocean Avenue) which sold in 2006 for $7,000,000

and resold in 2013 for $7,600,000, indicating a rising market, she replied "I guess I missed it." This is not a credible assertion since she used this same property as a comparable. The court has no information whether the Deal property was improved or not (she claimed it was in average condition) or whether it was oceanfront as the Subject. Her report claimed that 5% depreciation was supported by "tax assessor ratios and market derived data for the Elberon Section" of the City. However, the market data, which were a compilation of closed home sales using data from Multiple Listing Services, were for the entire City, not just of the Elberon Section. Further, many home sellers in the Elberon Section do not list properties on MLS. Thus, the City's expert's 5% increases to the 2006 comparable sales are more credible being based on the paired sale in the City.

Plaintiff's expert's subjective adjustment for lot "depth" is not credible.[10] She stated that since non-oceanfront lots sell for much less than oceanfront lots, the depth of an oceanfront lot is also of much less value.[11] While it may be true that non-oceanfront lots sell for less, the court is unpersuaded that the corollary to this is that the footprint within a parcel will sell for less because

---

[10] It is unclear how she extracted a depth adjustment (4%, 3%, and 6% for tax years 2011, 2012; 8%, 25%, 5%, 1%, 3% for tax years 2013 and 2014). They appear to have no relationship to her conclusion that the value of non-oceanfront properties was $112 PSF (adjusted), a measure she used to show that lot depth suffers decreased value. See infra n.12. The allowances were also not uniform. For instance, she used 4% as the lot depth adjustment for Sale 1 (6 Adams Street with a depth of 266 SF) for tax years 2011 and 2012. For tax years 2013 and 2014, however, she used 8% as the lot depth adjustment for the same comparable. Similarly, she used 3% as the lot depth adjustment for Sale 2 (10 Plaza Court with a depth of 216 SF) for tax years 2011 and 2012. For tax years 2013 and 2014, however, she used 5% as the lot depth adjustment for the same comparable.

[11] Plaintiff's expert used three vacant non-oceanfront land sales in the City (903 Ocean Avenue; 1 Sycamore Avenue; 7 Plaza Court). She adjusted the prices for time, size, ocean frontage, and zoning. She concluded that the adjusted $112 PSF is about 26% lower than her adjusted value of vacant oceanfront lots at $143 PSF for tax years 2011 and 2012 (the $31 differential actually translates to 21%). This proved that oceanfront lots are more desirable, thus, more expensive. The court notes that the $112 PSF computation is flawed. The expert claimed that the market extraction value of land for the non-oceanfront comparable 3 was $1,475,000. The Monmouth County Board of Taxation's website (www.njactb.org) also shows that the sale price of $1,475,000 was for land plus improvements, as were all assessments since its sale in 2010. Extremely puzzling is her adjustment for ocean frontage (-75; -17%; 28%). The analysis was a separate grid to show for how much non-oceanfront properties sold. That means these comparables had no ocean frontage. That grid was not making a comparison to other oceanfront properties, including the Subject, therefore, the expert should never have applied an adjustment for ocean frontage. Those percentage adjustments were also inexplicable. The grid showed street addresses instead of the area fronting the ocean. Adjustments were negative indicating the Subject's inferiority, i.e., having lesser ocean frontage than the comparables. This is counter-intuitive since she is trying to show that non-oceanfront properties are less desirable than the Subject.

17

it is farther away from the house. Under her theory, every square foot of land not immediately fronting the ocean is of lesser value, thus the area where the house will sit, or the backyard where the amenities such as a pool is located will command a lower price. This makes no sense since a buyer purchases a buildable lot. More importantly, however, her "depth" adjustment is duplicative since she made positive adjustments for lot size, and a lot's size accounts for both frontage and depth.

Plaintiff's expert's adjustment for the area of a lot facing the ocean is also subjective. Her percentage adjustments are -5% to -7% for a difference of 30 feet to 50 feet. While it is no doubt reasonable to posit that the more area a lot or site has along the beachfront, the more desirable, therefore, more expensive, it is unclear if people would pay $250,000 (5% of the sale price of $5,000,000) for additional 30 feet of area fronting the beach.

Both experts agreed that a size adjustment is warranted due to economies of scale. Plaintiff's expert's adjustments were subjective.[12] The City's expert's size adjustment was based on comparing the difference in the price of the largest lot (907 Ocean Avenue) as compared to the average of the prices of two comparables (the Subject and 11 Pullman Avenue), and dividing the price differential by the difference in the square footage of these comparables. However, the court has rejected the use of the largest lot as a viable comparable due to its sheer size. For those same reasons, it would be problematic to use the comparable to extract a PSF number for size adjustment.

---

[12] Plaintiff's expert's size adjustments were much smaller than those she used for non-oceanfront properties (26%; 40%; and -31% for comparables sized 32,565SF; 62,291 SF; and 7,200 SF). Similar sized oceanfront properties of 39,150 SF; 36,720 SF; and 34,560 SF merited an adjustment of 6% and 5% in her oceanfront vacant lot analysis. The largest oceanfront lot sized 74,250 SF merited 9% positive adjustment whereas the largest non-oceanfront lot of 62,291 SF merited a 40% positive adjustment. The smallest oceanfront lot measuring 11,612 SF merited -5% adjustment whereas the smallest non-oceanfront lot of 7,200 SF merited a -31% adjustment. Presumably, the disparity is to show that lot sizes are not significant for oceanfront properties, however, this is not clear from plaintiff's expert's testimony or her report.

The experts used different lot sizes for the same comparable. Thus, for 10 Plaza Court, plaintiff's expert stated the size as 36,720 SF, while the City's expert stated it as 34,000 SF (which is the same number shown on the Monmouth County Board of Taxation website). For 6 Adams Street, plaintiff's expert stated the size as 39,150 SF (which is the same number shown on the Monmouth County Board of Taxation website but as "AVG" or average), while the City's expert stated it as 38,400 SF. For 12 Pullman Avenue, plaintiff's expert stated the size as 29,605SF, while the City's expert stated it as 31,030 SF. However, the Monmouth County Board of Taxation website shows a different measurement of 141x155 or 21,855 SF. Further, the City's expert stated the size of 11 Pullman Avenue as 22,010 SF whereas the Monmouth County tax Board's website shows this lot's measurement as 141x154 or 21,714 SF. Using the plaintiff's expert's measurements on the commonly used sales shows the following for purposes of size versus price comparison:

|   | Address | Date | Size (SF) | Price | SF Diff. |
|---|---------|------|-----------|-------|----------|
| 1 | 11 Pullman Ave | 08/07/06 | 22,010 | $4,200,000 ($3,500,000 +20%) | 2,448 |
| 2 | 10 Plaza Ct | 11/03/11 | 36,720 | $5,337,122 | 17,158 |
| 3 | 6 Adams Street | 12/14/11 | 39,150 | $5,000,000 | 19,588 |
| 4 | 12 Pullman Ave | 06/01/14 | 29,605 | $4,570,000 | 10,043 |
| 5 | Bayhead | 01/28/10 | 34,560 | $4,950,000 | 14,998 |
| 6 | Monmouth Beach | 05/28/13 | 11,612 | $1,260,000 | 7,950 |

Eliminating the sale in Monmouth Beach both because it is outside the range[13] and is a sale in a non-comparable municipality, the above shows that the price range for a lot sized between 30,000

---

[13] The court notes that the two comparables outside the City are in the single-family residential zone (R-100 and A). However, there is no information whether the land-to-building ratio or other zoning limits are the same as in the City and for the Subject so that the same maximum productivity and financial feasibility is achieved. Plaintiff's expert agreed with the City that homeowners in Elberon use their properties as second (summer) homes. Although she claimed that good school districts increase value of homes generally, this does not refute the concession that for second homebuyers in Elberon good school districts is not a primary consideration.

SF and 39,000 SF is $4,500,000 to $5,000,000. The lot closest in size to the Subject is about $4,000,000 (without even considering a positive adjustment for market conditions based on the paired sale in the City). The ranges indicate that the Subject's price (for vacant land) would fall between $4,000,000 to $4,200,000. The court finds that taking all the factors into account, the land value for the Subject is $4,000,000 for each tax year at issue. This then supports the City's assessment for 2011 and 2012 since the assessed-to-true value is within the average ratio for each tax year. The assessments for 2013 and 2014 would similarly have to be affirmed since the assessed-to-true value ratios (using the agreed to improvement value of $798,406) would also fall within the average ratios for those tax years. Consequently, the court affirms the assessments for all years at issue.

## CONCLUSION

For the aforementioned reasons, the court affirms the assessments for the tax years at issue. Judgments will be accordingly entered.

Very Truly Yours,

Mala Sundar, J.T.C.

20