LASSER, P.J.T.C.
In this action taxpayer contests the 1986 local property tax assessment on a 304-bed proprietary nursing-home property located at 77 Madison Avenue, Morristown, and known as Block 110, Lot 16 on the tax map of the taxing district.
The contested assessment is:
Land $ 314,000
Improvements 4,755,400
Total $5,069,400
The 1986 tax rate for Morristown is $5.20 and the common level of assessment as established by the Director of the Division of Taxation pursuant to N.J.S.A. 54:1-35.1 is 45.22%, with an upper limit of 52% and a lower limit of 38.44%.
This appeal was brought directly to the Tax Court pursuant to N.J.S.A. 54:3-21. Valuation and discrimination are in issue.
The subject is a Y-shaped, five-story and basement, brick, steel and concrete structure built in 1974. It is located on a parcel of land containing 2.71 acres. The property is zoned OB (Office, Business), and the present use is a conditional use in this zone. The appraisal experts agree that the present use is the highest and best use of the property.
*389 The property is located directly across the street from Morris-town Memorial Hospital, near the center of Morristown. The building contains approximately 112,000 square feet including the basement, with a ground floor area of 18,678 square feet. There are 161 guest rooms, of which 18 are private. On the first floor, there is a lobby-reception area, dining room, kitchen, living room, general offices and three elevators. The upper floors have patients’ rooms, nursing stations and cleaning rooms. The basement is improved with a chapel, recreation room, beauty parlor, therapy rooms, employee lounge, laundry, storage and maintenance rooms. The building is fully sprinklered and air conditioned and was in good condition on the October 1, 1985 assessing date. Most of the land not devoted to the building is paved parking area for 120 cars.
The building is designed for convalescent care of nonambulatory patients and was originally used for that purpose, but over the years fewer nonambulatory patients and more ambulatory patients have occupied the property. Consequently, there is more movement from floor to floor and more use of elevators than originally anticipated, resulting in some delay at the elevators, particularly during mealtimes.
The patients are a mix of Medicaid and private patients. Medicaid per diem rates are established by the State of New Jersey, and in order to qualify for Medicaid payments, at least 45% of the patients must be Medicaid patients. Private patients pay higher rates than Medicaid patients, and therefore the higher the ratio of private patients to Medicaid patients the greater the income. In 1983 there were 55 (18% of total beds) private patients; in 1985 there were 51 (16.8%), and in 1986 there were 90 (29.6%).
There is a relatively high turnover of patients:
Admissions Discharges
1985 195 203
1986 304 302
The patient mix and daily rates in 1985 were:
*390 % Daily Rate
Private 16.8 $81.60
Medicaid 81.4 55.52
Welfare 1.0 56.34
Medicare .7 63.84
The original developer-operator of the property was a limited partnership, Twin Oaks Associates. This partnership was formed in 1972 for the purpose of acquiring a lease to the Morristown land and constructing a nursing home. In connection with an arrangement for the sale of the nursing home operation, Twin Oaks Associates, the ground-lease tenant, entered into a lease of the nursing home operation with Twin Oaks Nursing Home, Inc., a related corporation, dated December 31,1984, for a 30-year term ending December 31, 2014, at a net rental for the first ten years of $619,000, increasing by $12,000 for the next five years and each ensuing five-year period, so that the rental for the final five-year period amounts to $667,000. In the lease, the parties allocated $166,702 of the rent to nursing home furniture and equipment. On January 1, 1985 the nursing home operation was sold by assigning the operating lease to Health Resources of Morristown, Inc. for $2,450,000, payable $950,000 in cash and $1,500,000 by a ten-year, 9% note. Thus, the purchaser, Health Resources of Morristown, Inc., was obligated to pay to Twin Oaks Associates the $950,000 cash payment, the installment payments on the note and the annual lease rental.
It appears that the subject land is owned by the individuals who were the original general partners of Twin Oaks Associates. Twin Oaks Associates appears to be the tenant under a ground lease. There is no evidence of the rental or terms of the ground lease.
/.
The appraisal expert for the taxpayer utilized the income and cost approaches in estimating the value of the property. His cost approach opinion was based on two methods, first, the actual 1974 construction cost of the subject property, which he *391 trended up to the October 1, 1985 assessing date, and second, the Marshall Valuation Service calculator cost method, to obtain the cost as of October 1, 1985.
In his actual 1974 cost method this expert used the construction cost, including architect’s fees, interest, taxes and insurance during construction, off-site costs, miscellaneous costs and builder’s profit, which totaled $4,144,984. He then adjusted this cost to October 1, 1985 by multiplying by a factor of 2.09, for an assessing date cost of $8,663,017. He depreciated this cost, for physical deterioration only, at 2% a year for the 11 years of the building’s existence, deducting $1,903,017, for a net cost of $6,760,000. He added his land value of $1,125,000, for a total value of land and improvements of $7,885,000.
Using the Marshall Valuation Service calculator cost method, taxpayer’s appraisal expert estimated the replacement cost on October 1,1985 to be $9,155,109. He deducted 22% for physical depreciation to arrive at a depreciated cost of $7,140,000. To this he added land at $1,125,000 for a cost approach value by this method of $8,265,000. He averaged the two cost figures ($7,885,000 and $8,265,000) at $8,075,000 and deducted his income approach value of $6,900,000 {infra), which yielded a difference of $1,175,000, which he attributed to economic and functional obsolescence and deducted from his cost of $8,075,-000 to reduce his cost approach value to $6,900,000.
In his income approach, taxpayer’s appraisal expert also used two methods: first, an estimate of value based on New Jersey Medicaid capital facilities allowances and reimbursements used in calculating the Medicaid patient per diem rate; and second, an income approach deriving the rental income from the actual lease of December 31, 1984.
For his Medicaid income approach he used the Medicaid rate of $5.6998 per patient day for capital facilities (land and improvements) to arrive at a rental value of $604,116 ($5.6998 X 304 patients X 365 days x 95.52% occupancy = $604,116). From this he deducted 5% (for expenses and reserves of $30,-116) for a net income of $574,000. This figure, when capitalized *392 at 11.51% (75% mortgage at 12.34% constant and 25% equity at 9% return) yielded a value of $4,986,967, which the expert rounded to $5,000,000.[1]
Taxpayer’s appraisal expert regarded the sale of the lease of the subject property as an arm’s-length transaction from which an economic rent for the property can be derived. In processing this information the expert first took the sums received from the sale of the lease. To the $950,000 cash payment he added the installment note payments discounted at an annual rate of 11.51% or a present value of $1,317,317, for a total of $2,267,317. He treated this sum as an annuity over a 30-year period at 11.51% interest, which would be the equivalent of adding $271,296 per year to the rental payments. He converted the actual variable rental payments to a level rental of $625,962 per year and added this to the $271,296 per year received from the sale proceeds for a total of $897,258, which he rounded to $900,000. From this sum he deducted $65,000 as the amount attributable to the furniture, fixtures and equipment included in the lease, for a rental attributable to the real estate of $835,000 per year.
Using this rental value, taxpayer’s appraisal expert arrived at the following income approach value:
Estimated rental value $ 835,000
Less: landlord's expenses and reserves (5%) 41,750
Net income before interest or recapture • 793,250
$793,250 capitalized at 11.51% 6,891,833
Value of land and improvements (rounded) $6,900,000
Taxpayer’s appraisal expert notes that on December 31, 1984 an assignment of lease was negotiated by taxpayer’s parent corporation with the same developer-operator for a 180-bed nursing home constructed in 1970 in Cedar Grove. The lease was for a 30-year term, with rents beginning at $465,600 net, rising to $513,600 per year. He attributes the higher rent per *393 bed of the Cedar Grove nursing home to the higher Medicaid rate per bed and the higher percentage of private patients in that facility.
Taxpayer’s appraisal expert stated that the value of the subject property ranges from $5,000,000, based solely on the June 1977 New Jersey Medicaid rate for capital improvements, to $8,075,000 using the cost approach and deducting only for physical deterioration. The expert concluded that obsolescence must also be deducted and that therefore the value of the property is $6,900,000.
A vice-president of Health Resources of Morristown, Inc. testified that the parent company owns and operates eight nursing homes and operates two others. He stated that subsidiaries of the parent company are tenants of both the subject property and the Cedar Grove nursing-home property. He testified that the subject land was owned by a partnership and leased to Twin Oaks Associates, a limited partnership, which leased the building and land to Twin Oaks Nursing Home, Inc. which operated the nursing home. His company, Health Resources, purchased the lease. At the time of purchase there were about 30 private patients, or approximately 10% of the patient beds. When negotiations began, there were 50 private patients and the price had been negotiated based on 50 private patients. The number of private patients has increased since his company’s purchase of the lease.

II.

The appraisal expert for the taxing district valued the property by the cost approach. He was of the opinion that the property is special purpose property because the real estate and the business conducted in it are intertwined, and the business requires skilled management and is regulated by the State. He concluded that since the income and expenses are controlled by the State, the income approach could not be used because of the inability to ascertain economic rent. He stated that comparable sales of high-rise nursing homes/convalescent centers such as *394 the subject were not available and therefore the market data approach could not be used.
His analysis of five land sales led him to the conclusion that the land had a value of $250,000 an acre or $675,000 for the entire parcel. In his cost approach he used the Marshall Valuation Service cost calculator method to derive a cost of $110 per square foot. This expert’s cost approach calculations follow:
Land (2.7 acres at S250,000/acre) $ 675,000
Improvements Building 112,400 sq. ft. at $110/sq. ft. $12,364,000
Less physical depreciation (10%) -1,236,400
Depreciated value $11,127,600
Parking area, lighting & landscaping 100,000
Total improvements 11,227,600
Total value _ $11,902,600

III.

Proprietary nursing homes have unique characteristics which make it difficult to estimate their market value. Real estate alone is not the primary income producer as in an apartment house. Income is produced by a combination of the real estate, the personal property, which includes furniture, fixtures and equipment, and the services rendered by the staff, including food, 24-hour nursing services and activities for the patients. There is a limited market for proprietary nursing homes, and the real estate has limited alternate uses. The ability of the nursing home property to produce income is the source of the value of the real estate, but the income approach and the market approach suffer the disability of combining the value of the real estate with the value of the business conducted in the real estate. The income depends on the mix of private and Medicaid patients and the efficiency of management in maximizing income and minimizing expenses. See Friedman, Encyclopedia of Real Estate Appraising, (3 ed. 1978) 1005-1022.
Taxing district argues that since the income of a proprietary nursing home is limited by government-mandated rates for the majority of the patients, the income approach is not appropriate *395 because the income attributable to the real estate constitutes regulated, not economic, rent. Taxing district contends that if the property is valued for assessment purposes by the cost approach, this will reflect market value on an unregulated basis and taxpayer cannot complain of unequal treatment because 90% of the resulting real estate tax is reimbursed by the state and federal governments as part of the mandated rate structure. To the extent that the state and federal governments subsidize patients by regulating rates, they negate the effect of this regulation by paying the consequent real estate taxes. I find that there is some weight to taxing district’s argument, although the income and market approaches are useful where suitable information is available. In this case neither party presented evidence of sales of comparable nursing homes. The sale of the subject lease and the income approach based on the actual income and expenses give an indication of value but are not conclusive because the income in taxpayer’s first income approach method is based on a rate fixed in 1977, and in both methods is affected by the mix of private and Medicaid patients, and the number of private patients is increasing. No income approach valuation based on actual or projected net income was furnished.
The fact that taxpayer’s expert’s income approaches indicate a lower value does not justify a deduction for obsolescence because the income approaches are based on actual rent, not economic rent, and do not take into consideration the increasing ratio of private pay patients. The operator has chosen to accept Medicaid patients and thus a government-regulated rate. Along with this rate goes a 90% reimbursement for real estate taxes. Uniformity of assessment requires that all income-producing properties be valued based on their economic rent, not their actual rent. Parkview Village Assocs. v. Collingswood Boro., 62 N.J. 21, 297 A.2d 842 (1972). Because there is no evidence of either economic rent or comparable sales of nursing homes unencumbered by governmental rate restrictions, the cost approach is the only method by which to value the property uniformly with other properties in the taxing *396 district. Therefore, I rely solely on the cost approach and make no allowance for either functional or economic obsolescence.
There may be deficiencies in the building design, particularly in the number of elevators. However, an offsetting factor is the subject’s excellent location across the street from the hospital, in a central area convenient for patients, employees and doctors, on a major road with good access and high visibility. Taxpayer’s appraisal expert indicates that a one-story nursing home would not suffer the obsolescence of the subject because it would not have to rely on elevators for transportation. However, a high-rise is necessary where a nursing home is constructed in a central location, as is the case here. The excellent location balances out the inconvenience of vertical transportation of patients.
A comparison of the cost approaches of the two experts reveals differences in the square-foot area of the building (112,068 vs. 112,400); the method used to calculate the base cost (táxpayer’s expert divided the building into four separate parts—the core, the wings, the basement core and the basement wing—and used different base costs for each, while the taxing district’s expert used an overall base cost for the entire building); the story height (taxpayer’s expert contends that he used the actual story height of 9.7 feet, and made a deduction adjustment for this height, while taxing district’s expert made no adjustment); the number of stories (taxpayer’s expert used two stories over three stories plus basement while taxing district’s expert used three stories over three stories), and soft costs and entrepreneurial profit (taxing district’s expert added 5% for soft costs and 15% for entrepreneurial profit while taxpayer’s expert did not add for these items). These are the major differences that resulted in taxpayer’s final cost being $81.69 per square foot as against taxing district’s $91.55 per square foot before soft costs and entrepreneurial profit were added, and $109.86 rounded to $110 per square foot after they were added. From the final cost, taxpayer’s appraisal expert deducted 22% for physical depreciation, while taxing district’s expert deducted 10%.
*397 I have reviewed the differences in the experts’ cost approach methods and accept taxpayer’s appraisal expert’s cost approach value as of October 1, 1985 of $9,155,109 before depreciation and functional and economic obsolescence, which he arrived at by use of the Marshall Valuation Service. I accept taxpayer’s square-foot area of 112,068 square feet partly because, in a prior year’s appraisal, taxing district’s expert used 112,065 square feet, and there is no explanation of his present use of the higher 112,400 square feet. I find taxpayer’s method of dividing the building into segments in order to reflect the different costs of the segments to be more accurate. I find that his adjustment for story height is preferable, as well as his characterization of the building as a five-story building with basement rather than a six-story building.
To taxpayer’s appraisal expert’s replacement cost of $9,155,-109, I add 10% for entrepreneurial profit. This addition is provided for by the American Institute of Real Estate Appraisers, The Appraisal of Real Estate, (8 ed. 1983) as follows:
For the cost approach to provide a sound indication of value, an appraiser must add to the direct and indirect costs a figure for the entrepreneurial profit that is reflected in the market ... The profit may be a percentage of the total direct and indirect costs ... Because the extent of entrepreneurial profit varies with economic conditions, a typical relationship between it and other costs is difficult to establish; however, entrepreneurial profit should not be omitted from the cost approach. Entrepreneurial profit is a necessary element in the motivation to construct improvements, [at 454-455]
Although there is no acceptable market-derived evidence of the price that the subject property will sell for in the market, on an unencumbered basis, from which to determine the difference between the replacement cost and the market value, I must assume that this nursing home would not be built, with all of the permits and licenses required, unless the developer could be assured that his efforts would be compensated. For this reason I have selected a 10% figure to represent entrepreneurial profit and the portion of the soft costs that are not already included in the Marshall Valuation Service replacement cost figures. I find support for this treatment in Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481, 534-535 (Tax Ct.1983), where the court also adopted a 10% figure.
*398 I will apply physical depreciation of 1% per year or 11% and accept the taxing district’s estimate of land value of $675,-000. Applying the foregoing results in the following value for the subject property:
Replacement cost $ 9,155,109
Plus entrepreneurial profit (10%) 915,511
510,070,620
Less physical depreciation (11%) —1,107,768
Depreciated cost 5 8,962,852
Land value 675,000
Total value __ 5 9,637,852
The upper limit of the common level range is 52%. $5,011,683 is 52% of $9,637,852, and is less than the 1986 assessment of $5,069,400. Since the 1986 assessment exceeds the upper limit of the common level range, it must be reduced to the common level ratio of 45.22%. This figure is $4,358,237, which I alloCa^e:
Land $ 305,000
Improvements 4,053,237
Total §4,358,237
The Clerk of the Tax Court is directed to enter judgment in accordance with the foregoing.

The State Medicaid payments are based on rates determined as of June 1977, which include a constant return of 10.719% for land and 11.6312% for improvements. Under the formula, approximately 90% of real estate taxes are reimbursed by New Jersey.