NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Patrick DeAlmeida**
**Presiding Judge**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625-0975
(609) 815-2922 x54620

November 8, 2017

Salvatore Alfieri, Esq.
Cleary, Giacobbe, Alfieri, Jacobs, LLC
Lakeview Professional Building
5 Ravine Drive
Matawan, New Jersey 07747

Eileen W. Toll, Esq.
Schneck Law Group, LLC
301 Livingston Avenue, Suite 105
Livingston, New Jersey 07039

Re:     962 River Avenue, LLC v. Township of Lakewood
        Docket No. 004744-2013

Dear Counsel:

This letter constitutes the court's opinion after trial in the above-referenced matter challenging an assessment on real property for tax year 2013. The central question before the court is which of two approaches to value – the income capitalization approach, or the cost approach – will provide the most credible evidence of the true market value of the subject property, a skilled nursing and rehabilitation facility. For the reasons stated more fully below, the court concludes

that the cost approach is the more credible way to determine the property's true market value. As a result of this conclusion, the court adopts the opinion of true market value offered by the township's expert and affirms the assessment for tax year 2013.

I. Procedural History and Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

Plaintiff 962 River Avenue, LLC, is the owner of real property in defendant Lakewood Township. The parcel, designated in the records of the municipality as Block 430, Lot 64, and commonly known as 962 River Avenue, is approximately 5.65 acres on which sits a 126-unit, 242-bed, skilled nursing facility that provides short-term rehabilitation services, long-term care, and specialty services for Huntington Disease. The building is approximately 81,500 square feet with a 16,272 square-foot basement.[1] Originally constructed in 1983, the structure has undergone extensive renovations, including the construction of an addition, completed in 2008. The building is primarily concrete block with stucco finish and has two stories with two elevators.

Approximately 90% of the income at the facility is derived from residents receiving Medicaid assistance. The remaining 10% of income is obtained from of private sources and Medicare. Patients at the subject property, as is generally the case at nursing and rehabilitation facilities, pay for both care and lodging. Undoubtedly, the larger share of patient fees are for nursing and personal care, but it cannot be disputed that a portion of the fees are for a tenancy in real property. See Rolling Hills of Hunterdon, L.P. v. Township of Clinton, 15 N.J. Tax 364, 367-

---

[1] The parties offered conflicting testimony with respect to the size of the building. Plaintiff's expert testified that the building is approximately 75,000 square feet. The court finds credible the testimony of defendant's expert that the building is 81,500 square feet in size.

68 (Tax 1995)(holding that nursing home is income-producing property for purposes of <u>N.J.S.A.</u> 54:4-34).

For the tax year 2013, the subject property was assessed as follows:

| | |
|---|---|
| Land | $ 2,260,000 |
| Improvement | $ 8,870,300 |
| Total | $11,130,300 |

The Chapter 123 average ratio for the municipality for tax year 2013 is 85.94%. When the average ratio is applied to the assessment, the implied equalized value of this parcel for tax year 2013 is $12,951,200 ($11,130,300 ÷ .8594 = $12,951,245).

On April 1, 2013, plaintiff filed a Complaint challenging the tax year 2013 assessment.

During the trial, each party presented an expert real estate appraiser who offered an opinion of the true market value of the subject property on October 1, 2012, the relevant valuation date. There is no dispute that the witnesses were qualified to offer their expert opinions, summarized as follows:

| | |
|---|---|
| Plaintiff's Expert | $ 7,338,787 |
| Defendant's Expert | $13,469,000 |

Although the experts agreed that the highest and best use of the subject property was its continued use as a nursing and rehabilitation facility, they offered conflicting opinions with respect to which approach to determining true market value is appropriate for the subject. Plaintiff's expert offered an opinion of value based only on the income capitalization approach. Defendant's expert offered an opinion of value based only on the cost approach. Each expert considered, and ultimately rejected, other approaches to determining value.

## II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments . . . are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)(citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, supra, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998)(citation omitted); Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through

4

the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

At the close of plaintiff's proofs, the court denied the municipality's motion to dismiss the Complaint for failure to overcome the presumption of correctness attached to the assessment. The court placed its findings of fact and conclusions of law on the record in the presence of counsel.

Those findings and conclusions will not be repeated here at length. Put succinctly, the court concluded that the opinion of value offered by plaintiff's expert, which is based on an accepted methodology for determining the value of real property, if accepted as true, raises doubt in the court's mind with respect to whether the assessment on the subject property exceeded true market for the tax year 2013.[2]

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, supra, 100 N.J. at 413).

A.    Approaches to Valuation.

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.)(citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 2006)), certif. denied, 168 N.J. 291 (2001). "There is no single determinative approach to the valuation of real property." 125 Monitor Street, LLC v. City of Jersey City, 21 N.J. Tax 232, 237 (Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div.

---

[2]    At trial, the municipality also moved to strike the testimony of plaintiff's expert as a net opinion. The court denied the motion, placing its findings of fact and conclusions of law on the record.

1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominate approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

(1)     The Comparable Sales Approach

The comparable sales approach "usually provides the primary indication of market value in appraisals of properties that are not usually purchased for their income-producing characteristics." Appraisal Institute, The Appraisal of Real Estate, 419 (12th ed 2001). This method of valuation has been defined as "[a] set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales prices of the comparables based on the elements of comparison." Id. at 417.

(2)     The Income Capitalization Approach

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed 2008). This approach generally applies to real property that generates income from the rental of the property, not from the business activities that take place at the property.

7

Determining the value of real property pursuant to the income approach can be summarized in the simplest terms as follows:

$$\begin{array}{r} \text{Effective Gross Income} \\ \underline{-\quad\text{Operating Expenses}} \\ \text{Net Operating Income} \end{array}$$

$$\begin{array}{r} \underline{\div\quad\text{Capitalization Rate}} \\ \text{Value of Property} \end{array}$$

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed 2008). In addition, where the sale of the subject property will include all assets of a business enterprise closely associated with the subject property it is necessary to extract from the value conclusion the value of personal property, often referred to as furniture, fixtures and equipment, and the value of the business enterprise to arrive at a value of only real property. Chesapeake Hotel, LP v. Township of Saddle Brook, 22 N.J. Tax 525, 526 (Tax 2005).

(3) The Cost Approach

The cost approach is normally relied on to value special purpose property or unique structures for which there is no market. Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 407 (Tax 1985); Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd, 180 N.J. Super. 366 (App. Div.), certif. denied, 88 N.J. 495 (1981). The cost approach "involves a replication, through the use of widely accepted cost services . . . of the cost of the components of the building to be valued, less . . . depreciation[s]." Gale & Kitson Fredon Golf, LLC v. Township of Fredon, 26 N.J. Tax 268, 283 (Tax 2011)(quotations omitted). "A cost approach has two elements – land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax

8

403, 417 (Tax 2004). From the estimated reproduction cost is deducted depreciation from all causes. Depreciation is defined as a loss in value from three causes: physical depreciation, functional obsolescence and external economic factors. The cost approach is most effective when the property being valued is new, in light of the difficulties in accurately estimating the various components of depreciation. See Worden-Hoidal Funeral Homes v. Borough of Red Bank, 21 N.J. Tax 336, 338 (Tax 2004).

B.      The Legal Precedents.

There are two published opinions that guide the court's analysis with respect to the valuation of nursing and rehabilitation facilities. In Twin Oaks Assocs. v. Town of Morristown, 9 N.J. Tax 386 (Tax 1987), aff'd, 11 N.J. Tax 94 (App. Div.), certif. denied, 117 N.J. 155 (1989), the taxpayer challenged an assessment on a 304-bed proprietary nursing home. Income at the facility was derived from a mix of private patients and patients receiving Medicaid at per diem rates established by the State. Id. at 389. The taxpayer's expert used both the income capitalization approach and the cost approach to reach an opinion of value. Id. at 390. He also considered the sale of a ground lease at the subject property, a transaction between related parties he considered to be arms' length. Id. at 392. The appraisal expert for the taxing district used only the cost approach to determine value. Id. at 393. "He was of the opinion that the property is special purpose property because the real estate and the business conducted in it are intertwined, and the business requires skilled management and is regulated by the State." Ibid.

Judge Lasser analyzed the question of which approach would provide the most credible evidence of value as follows:

> Proprietary nursing homes have unique characteristics which make
> it difficult to estimate their market value. Real estate alone is not
> the primary income producer as in an apartment house. Income is

produced by a combination of the real estate, the personal property, which includes furniture, fixtures and equipment, and the services rendered by the staff, including food, 24-hour nursing services and activities for the patients. There is a limited market for proprietary nursing homes, and the real estate has limited alternative uses. The ability of the nursing home property to produce income is the source of the value of the real estate, but the income approach and the market approach suffer the disability of combining the value of the real estate with the value of the business conducted in the real estate. The income depends on the mix of private and Medicaid patients and the efficiency of management in maximizing income and minimizing expenses.

[Id. at 394.]

The court adopted the municipality's argument "that if the property is valued for assessment purposes by the cost approach, this will reflect market value on an unregulated basis . . . ." Id. at 395. The court noted, however, that "the income and market approaches are useful where suitable information is available. In this case neither party presented evidence of sales of comparable nursing homes." Ibid. In addition, the expert opinion of value reached through the income capitalization approach was based on a fixed rate of income when the mix of private and Medicaid patients was changing and "[n]o income approach valuation based on actual or projected net income was furnished." Ibid.

Judge Lasser concluded that "[b]ecause there is no evidence of either economic rent or comparable sales of nursing homes unencumbered by governmental rate restrictions, the cost approach is the only method by which to value the property uniformly with other properties in the taxing district. Therefore, I rely solely on the cost approach . . . ." Id. at 395-96.

The court in Regent Care v. City of Hackensack, 27 N.J. Tax 138 (Tax 2013), also used the cost approach to determine the value of a 180-bed nursing home. Use of that approach, however, was pursuant to a stipulation entered by the parties and adopted by the court. Id. at 143.

While Judge Andresini provides insight with respect to application of entrepreneurial profit and depreciation when valuing a nursing facility, the parties' stipulation obviated the need for the court to engage in an extended analysis of which approach to value would be most credible in that case.

C.      More Credible Approach to Value.

Plaintiff's expert rejected the comparable sales approach to determining value. He testified that the market would not produce credible comparable sales because the sales price of a nursing home facility is influenced by economic factors such as occupancy levels, room rates, income, patient mix, and operating costs, which differ widely from facility to facility. According to the expert, it would be difficult and speculative to make adjustments to sales prices to account for these factors, given the fact that many have little to do with the characteristics of the real property, but are associated with the business operations of the facility. In addition, according to the expert, this type of commercial information is held in a high degree of confidentiality by parties who buy and sell these types of properties, adding to the difficulty in making credible adjustments.

Defendant's expert also reject this approach to determining value, although his reasons for doing so were not fully stated in the record.

As was the case in Twin Oaks, neither expert in the present matter identified comparable sales of nursing facilities. There is, therefore, no evidence in the record with which the court could make a credible determination of value under the comparable sale approach.

Plaintiff's expert utilized the income capitalization approach to determine value, based on his finding that the operation of a nursing facility is similar to the operation of a hotel or golf course. In each of these instances, the income realized by the business operation is attributable both to the real property and to other services. The court has previously recognized that with respect to hotel properties it is possible to account for the income generated by the business in

order to estimate the income generated by the real property. See Glenpointe Assocs. v. Township of Teaneck, 10 N.J. Tax 380, 391 (Tax 1989)(applying Rushmore approach to determine value of hotel property), aff'd, 12 N.J. Tax 118 (App. Div. 1990); accord Prudential Ins. Co. v. Township of Parsippany-Troy Hills, 16 N.J. Tax 58, 60 (Tax 1995); see also Marina District Dev. Co, LLC v. City of Atlantic City, 27 N.J. Tax 469 (Tax 2013)(applying Rushmore method to determine value of casino/hotel property), aff'd, 28 N.J. Tax 568 (App. Div.), certif. denied, 223 N.J. 354 (2015).

The court concludes that use of the income capitalization approach in this matter is unreliable for two primary reasons. First, the trial record does not contain a reliable basis for determining market income and expenses at the subject property. There is no evidence of lease transactions for nursing or rehabilitation facilities. Thus, evidence of income attributable directly to the real property at such a facility is absent from the record. Plaintiff's expert used the actual income and expenses at the subject from Medicare, Medicaid and private sources, as market income and expense. The income represented charges that included both lodging and the various medical and other services provided to patients. He compared the subject's actual income and expenses to the actual income and expenses at a number of what he described as "skilled nursing facilities" in the area of the subject. The expert, however, did not identify the patient mix at the facilities to determine whether they were truly comparable to the subject property. In light of the regulated nature of payments for patients covered by Medicaid and Medicare and the changing nature of the patient mix at the subject property, a comparison of the patient population at the facilities studied by plaintiff's expert is essential to determine comparability.

Nor did plaintiff's expert account for the fact that several of the facilities he examined were assisted living facilities, in whole or in part, and that some were continuing care retirement

communities. These types of facilities differ in significant ways from a nursing and rehabilitation facility such as the subject. For example, the subject property is not limited to serving an elderly population and does not have an operating structure designed to permit patients to live in a relatively independent situation and to move to units with greater amounts of skilled care as the residents age or experience changes in their medical condition.

Second, the expert's adjustment to account for the income attributable to the business operations at the subject was not reliable. He testified that nursing and rehabilitation facilities generally are owner-occupied, given the fact that the operator of the facility must be licensed to provide care at that facility. Thus, he noted, there are few, if any, management contracts for nursing and rehabilitation facilities in the marketplace. In the absence of market data, the expert turned to existing management contracts for apartment buildings. The expert opined that apartment buildings generally "require a four to six percent management fee" and that "[r]ecognizing the subject's greater management requirements, we applied a 10% management fee." He cited no market data to support this adjustment.

It is evident that there is almost no similarity between managing an apartment building and managing a nursing and rehabilitation facility. The myriad regulated medical services, and care provided in a nursing and rehabilitation facility are in no way similar to the rudimentary services provided in an apartment building. Other than the fact that the two types of buildings provide a place for a person to live, the expectations of managing an apartment building – custodial services, maintenance, trash removal, rent collection – and the expectations of managing a nursing and rehabilitation facility – providing 24-hour medical care, treating, feeding, medicating, moving, bathing, entertaining, and monitoring patients, making beds, laundering linens, accommodating

visitors, and complying with a complex regulatory scheme, to name just a few – are too divergent to be comparable for purposes of estimating a management fee.

These shortcomings reflect some of the reasons why the income capitalization approach is problematic when endeavoring to determine the true market value of the real property components of a nursing and rehabilitation facility. The court concludes that the evidence of value reached under the income capitalization approach in the trial record is insufficiently reliable and will be given no weight.

The cost approach, on the other hand, will provide a credible method of determining value here in light of the special nature of the subject property and the dearth of reliable sales and income data. The court finds credible the opinion of defendant's expert that the subject property is a limited market, special purpose property. The structure was designed for a specific use and would likely require significant alterations to be put to any other use. While the subject is, in part, an older property, portions of the facility are of relatively recent vintage. The age and condition of the property will be adequately addressed through application of depreciation to the cost of replacement.

The court finds credible and adopts the opinion of value offered by defendant's expert using the cost approach. In reaching a value for land, defendant's expert utilized four sales. He reduced each sales price to a price per unit, which he opined was the industry standard. Comparable Land Sale No. 1, of a parcel in Camden County, occurred on September 20, 2004 for $1,200,000. The sale was contingent on approval for a 65-unit assisted living facility. The unadjusted sales price per unit was $18,462. The expert made a +25% upward adjustment due to the contingency, resulting in an adjusted unit price of $23,078.

14

Comparable Land Sale No. 2, of a parcel in Middlesex County, occurred on March 24, 2009 for $3,125,000. The property was approved for the construction of a 200-unit assisted living facility, resulting in a per-unit sales price of $15,625. The expert made a +5% adjustment for the size of the approved facility, given that a smaller size facility will sell at a higher price per unit. He offered an adjusted unit sales price of the comparable sale of $16,406.

Comparable Land Sale No. 3, of a property in Burlington County, took place on December 31, 2009 for $3,000,000. The property was sold with approvals for a 201-unit assisted living, independent living, and Alzheimer's disease facility. The per-unit sales price of $14,925 was adjusted by +5% as the subject property has fewer units. The expert offered an adjusted price per unit of $15,671.

Comparable Land Sale No. 4 occurred on December 7 and 8, 2011 for $2,671,115. The property, in Essex County, was sold contingent on obtaining approvals for an 85-unit assisted living facility. The sales price per unit of $31,425 was adjusted +25% for the contingency. The expert offered an adjusted sales price per unit of $39,281.

From the range of adjusted sales prices per unit of $15,671 to $39,281, the expert opined a sales price per unit of $25,000 for the land. Applying that price per unit to the subject's 126 units, the expert offered the opinion a land component under the cost approach of $3,150,000.

Because he did not take the cost approach, plaintiff's expert offered no comparable land sales of his own. Nor did the cross-examination of defendant's expert raise serious questions with respect the reliability of his comparable land sales or adjustments. Nothing in the record explains the significance, if any, of the fact that the comparable land sales were approved (or subject to approval) for assisted living facilities and not nursing and rehabilitation facilities. The issue was not explored at length at trial (the differences between these types of facilities was addressed with

15

respect to determining market income).  The court, having no basis to reject the expert's comparable land sales, adopts his opinion of land cost of $3,150,000.

Defendant's expert utilized Marshall & Swift Cost Estimator when determining the cost to replace the building.  He divided the subject property into five sections, applied a base cost of $128.58 per square foot to four of the sections and $76.43 per square foot to one section.  After accounting for the cost of sprinklers in all five sections, and the heating/cooling system in two sections, he reached adjusted costs of $143.01 per square foot for two sections, $128.01 per square foot for two sections, and $71.91 per square foot for one section.

The expert applied story multipliers, height multipliers, and floor area multipliers, as well as other improvement costs, to reach a total replacement cost new of $14,410,038.

To this cost, the expert added 5% for soft costs.  In addition, the expert added 10% entrepreneurial profit with a total replacement cost of $16,643,594.

On cross-examination, plaintiff questioned the applicability of entrepreneurial profit for a building likely to be occupied by its owner.  In Regent Care, supra, Judge Andresini explained that

> [e]ntrepreneurial profit reflects the difference between a property's total cost and its value after completion.  The Appraisal Institute, The Appraisal of Real Estate, 388 (13th ed. 2008).  It reflects "the entrepreneur's compensation for the risk and expertise associated with development."  Ibid.  An estimate of entrepreneurial profit is considered a fundamental component of a property's total cost.  Id. at 389.  "The range of profit will vary for different types of structures and with the nature or scale of a given project."  Ibid.  It is also recognized that "for certain types of specialized owner-occupied improvements, such as public buildings, no entrepreneurial profit may ever be recorded because the owner neither anticipates nor wants a profit."  Id. at 390.
>
> New Jersey courts include entrepreneurial profit in determining the market value of property when "the developer or owner-operator makes improvements to property with the anticipation of realizing a profit on its subsequent resale."  Westwood Lanes, Inc. v. Borough

16

of Garwood, 24 N.J. Tax 239, 249 (Tax 2008)(citing Lawrence Assocs. v. Township of Lawrence, 5 N.J. Tax 481, 535 (Tax 1983)). "New Jersey courts do not consider the status of the builder dispositive (as developer or owner-operator) to the determination of whether to include entrepreneurial profit within market value." Westwood Lanes, Inc., supra, 24 N.J. Tax at 249 (citing Beneficial Facilities Corp v. Borough of Peapack & Gladstone, 11 N.J. Tax 359, 381 (Tax 1990)). Entrepreneurial profit may still be inferred where there is no market data supporting its inclusion within market value if the court nevertheless concludes that the property would not be improved absent the likely compensation of a developer's or owner-operator's efforts. Westwood Lanes, Inc., supra, 24 N.J. Tax at 249 (citing Twin Oaks Assoc. & Health Res. v. Town of Morristown, 9 N.J. Tax 386, 397 (Tax 1987)). "Entrepreneurial profit is justified, even for an owner-occupied and owner-constructed building, because the principle of uniformity requires such property to be treated in the same manner as investment or speculation property." Beneficial Facilities Corp., supra, 11 N.J. Tax at 381. "[I]t is necessary to include a figure which reflects the time, effort and incidental expense of the owner in the development of the property." McGinley Mills v. Town of Phillipsburg, 9 N.J. Tax 508, 517 (Tax 1988).

[27 N.J. Tax at 150-51.]

The court agrees with Judge Andresini's reasoning and adopts his conclusions with respect to the propriety of including entrepreneurial profit for a building likely to be occupied by its owner.

In addition, the court concludes that the entrepreneurial profit offered by defendant's expert is reasonable. This court previously included a 10% entrepreneurial profit when determining the value of a nursing facility under the cost approach. See Twin Oaks, supra, 9 N.J. Tax at 397. The court, therefore, adopts the expert's opinion with respect to total replacement cost new of $16,643,594.

Defendant's expert thereafter applied depreciation to account for the building's age and condition, using the economic age-life method to calculate physical depreciation.

The economic age-life method estimates total depreciation by "calculating the ratio of the effective age of the property to its

17

economic life expectancy and applying the ratio to the property's total cost." The Appraisal Institute, supra, at 420 (13th ed. 2008). The economic age-life method is the simplest way to estimate depreciation. Ibid. The age-life method is a reliable estimate of depreciation and obsolescence when using the cost approach of valuation. See MCI Telecommunications Corp. v. Township of West Orange, 18 N.J. Tax 26, 35 (Tax 1998) aff'd, 19 N.J. Tax 114 (App. Div.2000).

[Regent Care, supra, 27 N.J. Tax at 153 (footnote omitted).]

The expert opined that the effective age of the improvements at the subject property was 15 years, given the varying construction dates and his conclusion that the building was neither functionally obsolete nor externally obsolete. Because the expected life of the structure is 40 years, the expert depreciated the replacement cost new by 38% ($15 \div 40 = 38\%$) or $6,324,566 ($16,643,594 x .38 = $6,324,566). This resulted in an opinion of the value of the improvements at the subject property of $10,319,028 ($16,643,594 - $6,324,566 = $10,319,028).

The court accepts the expert's calculation of physical depreciation. He personally conducted a physical inspection of the subject property and considered the renovations and addition in approximately 2008. While plaintiff's expert testified that the building was approximately 30 years old, he offered no opinion as to its effective age. Nor did he produce credible evidence that the building was functionally or economically obsolete.

Adding his opinion of land value to his opinion of improvement value, defendant's expert concluded a fair market value of the subject property as of October 1, 2012 of $13,469,000 ($3,150,000 + $10,319,028 = $13,469,028).

D.     Applying Chapter 123.

Pursuant to N.J.S.A. 54:51A-6a, commonly known as Chapter 123, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true value exceeds the upper limit of the common level range.  The common level range is defined by N.J.S.A. 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the subject property is located.

The formula for determining the subject property's ratio is:

Assessment  ÷  True Value  =  Ratio

Applied here, the formula produces a ratio of .8264.

$11,130,300  ÷  $13,469,000  =  .8264

The Chapter 123 common level ratio for Lakewood Township for tax year 2013 is .8594, with an upper limit of .9883 and a lower limit of .7305.  The ratio for the subject property for this tax year is .8264.  As the ratio falls within the common level range, no adjustment need be made to the assessment for tax year 2013.  The court will enter Judgment affirming the assessment.

Very truly yours,

/s/ Hon. Patrick DeAlmeida, P.J.T.C.

19